No. 2--05--1037

October 6, 2006

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| In re MARRIAGE OF JAMES A. SUSAN, | ) ) ) | Appeal from the Circuit Court of Lee County. |
| Petitioner-Appellee, | ) ) | |
| and | ) ) | No. 04--D--82 |
| MONICA R. SUSAN, n/k/a Monica R. Cearlock, | ) ) ) ) | Honorable Jacquelyn D. Ackert, |
| Respondent-Appellant. | ) | Judge, Presiding. |

JUSTICE O'MALLEY delivered the opinion of the court:

Respondent, Monica A. Susan, appeals the judgment of the circuit court of Lee County granting petitioner James A. Susan's petition to terminate maintenance. Respondent argues that the trial court's determination that she was cohabiting with Don Borski on a resident, continuing conjugal basis (see 750 ILCS 5/510(c) (West 2004)) was against the manifest weight of the evidence. For the reasons that follow, we affirm.

Petitioner and respondent were married on May 27, 1978. They had four children together: Lacey, Jenise, Kelly, and James. On June 27, 2000, the trial court dissolved the marriage. The dissolution order provided that petitioner pay respondent $750 twice per month for maintenance. On April 27, 2005, petitioner filed an amended petition to terminate maintenance, alleging that respondent was cohabiting with another person on a resident and continuing conjugal basis. On

September 1, 2005, the trial court held a hearing on the petition, during which the following evidence was adduced.

Respondent testified that she has lived in Stephenson, Michigan, since November 2000. None of her children live with her. Respondent began "going out" with Donald Borski in February 2002. Borski lives in Stephenson, about five miles away from respondent. Borski has four children: Chris, Ron, Mike, and Karen. After respondent began dating Borski, she did not date anyone else, although she did have sex with one other person sometime in 2003. She has not had sex with Borski for over two years.

One to two evenings per week, respondent has dinner at Borski's house. Two to three evenings per week, respondent goes to Borski's house to watch television or do some other activity. Respondent often sleeps over at Borski's house, and Borski often sleeps over at respondent's house. Borski has a key to respondent's house. Respondent does not have a key to Borski's house, but he is "always" home. When asked about other activities that she does with Borski, respondent stated that they have gone fishing, to a casino, or out to eat. Respondent works full time at Osco Drug, either from 8 a.m. to 5 p.m. or from 9 a.m. to 6 p.m.

Respondent and Borski have spent holidays together. Respondent testified that she spent Thanksgiving and Christmas with Borski in 2002, 2003, and 2004. One Christmas, Borski, along with his son Ron and Ron's two children, stayed at respondent's home. Borski and respondent shared a bedroom. Respondent's daughters Jenise and Kelly stayed with her as well. Borski's daughter Chris celebrated with them but spent the evening at Borski's home. Although she could not recall at the hearing, respondent testified in a prior deposition that she and Borski spent the Fourth of July together in 2002, 2003, and 2004. Respondent and Borski spent Easter together in 2003, 2004, and 2005. If respondent had to work on a holiday, she would see Borski after work. Respondent

also testified that she and Borski may have spent their birthdays together and that if Borski invites her, she accompanies him to family events. Respondent testified that she has sent out Christmas cards signed, "Love, Mom and Don." Respondent also sent Jenise a congratulations card signed, "Love, Mom and Don."

Respondent and Borski have gone on trips together. They spent five days camping and four-wheeling, along with respondent's son and her son's girlfriend. While camping, respondent and Borski shared a bed in a camper. Respondent and Borski attended respondent's nephew's wedding together in South Carolina. They spent a week in South Carolina and shared a hotel room but did not share a bed. Respondent testified that she has twice visited Borski's brother with Borski and stayed at Borski's brother's home. She could not recall if she visited Borski's brother a third time, in 2005. She also could not recall testifying at a previous deposition that she stayed with Borski's brother for four days in 2005. Respondent and Borski have traveled together to Batavia, Illinois, to visit respondent's friend. While there, the couple spent the night and shared a bed. Respondent and Borski also traveled to Morris, Illinois, to visit Kelly. Borski accompanied respondent on a six-hour drive to attend respondent's granddaughter's birthday party, and the couple spent the night. During Easter 2005, respondent and Borski visited Jenise and shared a bedroom in Jenise's home.

Respondent testified that Borski owns his own home. Respondent does not have a financial interest in Borski's home, nor does Borski have a financial interest in respondent's home. Respondent pays her own utility bills. Borski has never paid any medical, clothing, or grocery expenses for respondent or members of respondent's family. Respondent works full time; Borski is retired. Respondent has never paid any of Borski's expenses. Respondent has bank accounts in Menominee and Stephenson, Michigan, and in Morris, Illinois. Borski does not have a financial interest in respondent's bank accounts. Respondent and Borski do not own any personal property

together. They do not keep clothing at each other's home. They have never discussed marriage. Respondent characterized her relationship with Borski as one of friendship.

Scott Rusinek, a private investigator hired by petitioner, testified that on at least one occasion he followed respondent to Borski's home in the evening and watched her park her car in Borski's garage. The next morning, Rusinek saw respondent and Borski leave the home together.

Following the presentation of evidence, the trial court made a number of factual findings. The trial court found that respondent and Borski began dating in 2002 and have engaged in a sexual relationship, "albeit infrequent," since that time. Respondent and Borski have spent most evenings together, including overnight, either at Borski's or respondent's house. The trial court noted that respondent presented no evidence that she ever spent an evening alone. The trial court also noted that respondent and Borski share meals together and that it was implied that the party preparing the meal was responsible for the expense of the meal. Respondent and Borski have vacationed together, have visited family together, and have attended the wedding of a family member of respondent. They have spent holidays together for the last few years. They sign greeting cards as "Mom and Don." Respondent does not have a key to Borski's home nor does she have a garage door opener for Borski's garage. Borski does have a key to respondent's home. Respondent and Borski do not share any financial interests. They do not share joint bank accounts. They do not jointly own any automobiles or real estate. They do not share personal property. Respondent and Borski each pay their own respective expenses. Respondent has never loaned Borski money. Respondent and Borski do not keep any of their clothing at each other's home. The trial court held that "The factors set forth by the case law weigh in favor of a finding that [respondent] and [Borski] are cohabiting on a resident, continuing, conjugal basis." The trial court noted that "[t]he only factor weighing against such a finding is the interrelation of their personal affairs." Respondent timely appealed.

Respondent contends that the trial court's determination that she and Borski were cohabiting on a resident, continuing conjugal basis was against the manifest weight of the evidence.

The trial court's termination of maintenance was based on section 510(c) of the Illinois Marriage and Dissolution of Marriage Act (the Act), which provides, in pertinent part, that "the obligation to pay future maintenance is terminated *** if the party receiving maintenance cohabits with another person on a resident, continuing conjugal basis." 750 ILCS 5/510(c) (West 2004). "The rationale behind termination of maintenance when resident, continuing, conjugal cohabitation exists is the inequity created when the ex-spouse receiving maintenance becomes involved in a husband-and-wife relationship but does not legally formalize it, with the result that he or she can continue to receive maintenance." In re Marriage of Herrin, 262 Ill. App. 3d 573, 577 (1994). The burden is on the party seeking the termination of maintenance to prove that the ex-spouse receiving maintenance is involved in a de facto husband and wife relationship with a third party. In re Marriage of Lambdin, 245 Ill. App. 3d 797, 801 (1993). In determining whether that burden has been met, courts look to the totality of the circumstances and consider the following factors: "(1) the length of the relationship; (2) the amount of time the couple spends together; (3) the nature of activities engaged in; (4) the interrelation of their personal affairs; (5) whether they vacation together; and (6) whether they spend holidays together." In re Marriage of Sunday, 354 Ill. App. 3d 184, 189 (2004). Our supreme court has indicated that a reviewing court will not disturb a trial court's finding of a de facto husband and wife relationship unless that finding is contrary to the manifest weight of the evidence. In re Marriage of Sappington, 106 Ill. 2d 456, 469 (1985); see also Sunday, 354 Ill. App. 3d at 189. Every case in which a termination of maintenance is sought presents a unique set of facts. In re Marriage of Bates, 212 Ill. 2d 489, 524 (2004). "No two cases in

this area will be alike because no two personal relationships are alike." Sappington, 106 Ill. 2d at 466.

Under the facts in this case, there can be little question that the trial court's finding of a de facto marriage was not against the manifest weight of the evidence. Respondent and Borski had been together for over three years at the time of the hearing, and the evidence demonstrated that they spent nearly every night together during their relationship. The evidence also showed that the two took many trips together and spent virtually all holidays together. In fact, the only factor from the above list that weighs against the trial court's finding is the fourth factor: the evidence indicated that respondent and Borski did not commingle funds or provide each other with monetary support.

Respondent argues that this fourth factor should be dispositive because "[m]aintenance is predicated upon a need for support by the spouse who is to receive maintenance" and, thus, "the most important question that arises in all termination of maintenance cases" is "whether the relationship has materially affected the recipient spouse's need for support." While we agree with respondent that "[m]aintenance is predicated upon a need for support by the spouse who is to receive maintenance" (Sappington, 106 Ill. 2d at 467), we disagree with her conclusion that the principle dictates that the recipient spouse's need for support is a factor in determining whether a de facto marriage exists. Quite to the contrary, it is well established that a finding of a de facto marriage rests on consideration of the above factors, and no one factor is controlling. See Sunday, 354 Ill. App. 3d at 189 (courts look at the totality of the circumstances in light of the factors). Thus, in Sappington, our supreme court rejected an argument that a recipient spouse's new relationship could not be a de facto marriage solely because the two people did not engage in sexual intercourse, and the court instead focused on whether the two people entered into a husband-and-wife-like

relationship.  Sappington, 106 Ill. 2d at 467 ("it is the husband-and-wife-like relationship which bears the rational relationship to the need for support, not the absence or presence of sexual intercourse").[1]

For clarity, we draw a distinction between consideration of the recipient's financial needs and consideration of the fourth factor above (the interrelation of personal affairs).  The import of the

---

[1]As discussed below, the quoted sentence from Sappington, and indeed Sappington itself, can be read two ways.  It can be read as relying on the "need for support" as a consideration in determining whether a husband-wife relationship exists, or it can be read as stating that the existence of a husband-wife relationship is the sole question in determining whether maintenance should be terminated.

fourth factor is not whether the new de facto spouse financially supports the recipient, but rather whether their personal affairs, including financial matters, are commingled as those of a married couple would typically be.  See In re Marriage of Toole, 273 Ill. App. 3d 607, 612 (1995) (considering among the totality of the circumstances the commingling of funds as indicator of nature of relationship); In re Lambdin, 245 Ill. App. 3d 797, 804 (1993) (same); In re Johnson, 215 Ill. App. 3d 174, 181-82 (1991) (same).

In pressing her argument, respondent incorrectly assumes that "all termination of maintenance cases" involve "relationships."  Respondent's argument essentially confuses two separate bases for terminating maintenance: termination due to substantial change in circumstances and termination due to de facto remarriage.  If a recipient spouse's relationship leaves the recipient financially secure, there may be a substantial change in circumstances warranting the termination of maintenance.  See 750 ILCS 5/510(a) (West 2004).  Of course, a substantial change in circumstances can arise independently of any relationship, romantic, conjugal, or otherwise.  On the other hand, where the asserted ground for termination is not a substantial change but rather a de facto marriage (750 ILCS 5/510(c) (West 2004)), the goal is not to determine whether the relationship leaves the recipient financially secure, but rather to determine whether the relationship leaves the recipient effectively married.  Indeed, in those cases examining whether there is a substantial change in circumstances, the most important question obviously is whether the change in circumstances has materially affected the recipient spouse's need for support.  But in cases involving de facto marriage, maintenance is terminated because the recipient spouse is involved in a husband-and-wife-like relationship.  Sappington, 106 Ill. 2d at 467 (" 'it was the intention of our legislature to provide for the termination of *** maintenance whenever the [recipient spouse] has entered into a husband-wife

relationship with another' "), quoting In re Support of Halford, 70 Ill. App. 3d 609, 612 (1979). While one of the numerous factors (none of which is individually dispositive) to be considered in determining whether a relationship constitutes a de facto marriage is the interrelation of personal affairs, the question of whether the relationship has materially affected the need for maintenance is just as irrelevant as it would be if the marriage were de jure rather than de facto.

Our reading of the two sections and how they fit within the Act brings us to the same conclusion. Section 510(a) of the Act (750 ILCS 5/510(a) (West 2004)) allows for either modification or termination of maintenance based on need. Section 510(c) (750 ILCS 5/510(c) (West 2004)), on the other hand, does not allow for modification of maintenance, but only termination. The sliding scale approach under section 510(a) is a much more sensible means of considering the parties' needs and adjusting maintenance to accommodate them than is the binary approach under section 510(c). Because section 510(c) does not allow for reduced maintenance payments, a court invoking section 510(c) based even in part on changed financial need would be forced to choose between maintaining the status quo or terminating maintenance altogether, regardless of the amount of change in need demonstrated. The fact that the legislature chose in section 510(a) to provide for modification or termination of maintenance based on changes in need and did not mention need or provide corresponding flexibility in section 510(c) leads us to conclude that need is no more a factor in de facto than in de jure marriage situations.

Further, though it is true that "[m]aintenance is predicated upon a need for support by the spouse who is to receive maintenance" (Sappington, 106 Ill. 2d at 467), section 510(c) makes no reference to any of the factors underlying an award of maintenance. Section 510(a), on the other hand, explicitly incorporates the factors to be considered in awarding maintenance. 750 ILCS

5/510(a--5) (West 2004) ("the court shall consider the applicable factors set forth in [section 504(a)]" of the Act, which lays out the factors to be considered in awarding maintenance). Thus, the rationale underlying an award of maintenance, including the recipient spouse's need for support, is expressly made relevant in a proceeding under section 510(a), but not in one under section 510(c).

A line of reported cases, some of which respondent cites, implies that the recipient spouse's need is a central factor in determining whether maintenance should be terminated on the basis that the spouse has entered into a de facto marriage. For example, in In re Marriage of Bramson, 83 Ill. App. 3d 657 (1980), the court concluded that the recipient spouse had not "established a husband-wife" relationship with a man, based on the facts that the two did not live together for a long period of time, dated other people, and never "commingled their funds, as might be expected in a husband-wife relationship." Bramson, 83 Ill. App. 3d at 662-63. The recipient also retained her name and received mail at a different address from the man. Bramson, 83 Ill. App. 3d at 663. After concluding that the two did not share a relationship tantamount to that of a husband and wife, the court in Bramson continued:

> "Moreover, the legislative intent does not appear to be an attempt to control public morals. [Citation.] Rather, an important consideration, divorced from the morality of the conduct, is whether the cohabitation has materially affected the recipient spouse's need for support because she either received support from her co-resident or used maintenance monies to support him. [Citation.]" Bramson, 83 Ill. App. 3d at 663.

Other appellate court cases have also implied that need is a factor in reviewing a finding regarding whether a de facto marriage existed. In In re Marriage of Reeder, 145 Ill. App. 3d 1013 (1986), the court affirmed a finding that a couple had not entered into a de facto marriage. The court

˘10˘

noted that the recipient spouse was the sole occupant of the basement of the man with whom she cohabited, the man lived upstairs, the spouse paid rent to the man, she did not sleep in the man's bedroom (although they did have regular sexual contact), the couple went out together very seldom, the two had no joint bank accounts or co-owned property, the spouse did her own cooking and chores, and the two did not vacation together. Reeder, 145 Ill. App. 3d at 1018-20. Based on these facts, the appellate court concluded that the spouse's "need for support ha[d] not been materially affected" by her cohabitation, and, accordingly, it affirmed the finding that the woman was not engaged in a resident, continuing conjugal cohabitation. Reeder, 145 Ill. App. 3d at 1021.

In In re Marriage of Arvin, 184 Ill. App. 3d 644 (1989), the court held that a trial court's conclusion that a couple established a de facto marriage was manifestly erroneous where:

> "Judith testified that Hamilton's $100 contribution toward the oil bill was the only contribution he made toward household expenses. The couple did not have a joint checking account and did not commingle funds in any manner. [There was no evidence] that Judith's cohabitation with Hamilton affected her need for support in any manner. *** [There was no evidence that] Judith used maintenance payments to support Hamilton. Additionally, Judith testified that she and Hamilton seldom ate together, she never did his laundry, and they only occasionally slept in the same bedroom." In re Marriage of Arvin, 184 Ill. App. 3d at 649-50.

In In re Marriage of Caradonna, 197 Ill. App. 3d 155 (1990), the court affirmed a finding that a couple had not entered into a de facto marriage where the couple lived together for 10 months, shared a bedroom, had sexual relations for 6 to 7 months, and did not share expenses. The court reasoned that there was little evidence that the relationship "materially affected [the recipient

spouse's] need for support, which in [its] view is an important factor in determining whether a <u>de facto</u> husband-wife relationship has been established." (Emphasis in original.) <u>Caradonna</u>, 197 Ill. App. 3d at 160. The court then emphasized the short duration of the couple's relationship as another basis for affirming the finding that there was no <u>de facto</u> marriage. <u>Caradonna</u>, 197 Ill. App. 3d at 160.

In <u>In re Marriage of Frasco</u>, 265 Ill. App. 3d 171 (1994), the court reversed a finding that a couple did not enter into a <u>de facto</u> marriage where they lived together, ate all of their meals together, took vacations together, had joint checking accounts, and did not date other people. <u>Frasco</u>, 265 Ill. App. 3d at 177. The court acknowledged several reported cases, including <u>Bramson</u>, that "expressed the view that one factor to be considered in cohabitation cases is whether the cohabitation has materially affected the recipient spouse's need for support because she receives support from her coresident or has used maintenance funds to support him." <u>Frasco</u>, 265 Ill. App. 3d at 177. However, the court reconciled its holding with those cases, on the ground that it did not "believe that a shown need for support can be controlling and in itself sufficient to defeat a petition to terminate maintenance when all other factors demonstrate an ongoing, conjugal relationship to exist." <u>Frasco</u>, 265 Ill. App. 3d at 177.

Each of the cases above relies on several of the six factors listed herein in reaching a holding regarding the existence of a <u>de facto</u> marriage, but each also discusses the recipient spouse's financial needs, whether maintenance was used to purchase items for the alleged <u>de facto</u> husband, and whether the alleged <u>de facto</u> husband provided support to the recipient spouse. Thus, each of the cases refers to the recipient spouse's need as an additional justification for a finding, based on the relevant factors, that maintenance should be terminated due to a <u>de facto</u> marriage. However, the

plain language of section 510(c) of the Act does not contemplate an analysis of the recipient spouse's needs. 750 ILCS 5/510(c) (West 2004). The justification for the de facto marriage rule has nothing to do with financial need--the rule is designed to "remedy the inequity created when the recipient spouse becomes involved in a husband-wife relationship but does not formalize the relationship" and thus avoids termination of maintenance due to remarriage. Sunday, 354 Ill. App. 3d at 189. Under the plain language of the Act, no further justification is needed. Roofe, 122 Ill. App. 3d at 60 (citing Bramson for the proposition that the concern underlying the Act was for the recipient's need for support, but stating that "[t]his does not mean *** that an economic analysis of the recipient's need is necessary under the Act. The respondent was required to prove only that the petitioner was cohabiting on a resident, continuing conjugal basis"); Frasco, 265 Ill. App. 3d at 178 ("We note that an analysis based on need appears nowhere in the statute and would not be an appropriate consideration were termination sought on the basis of petitioner's remarriage").

In reaching our holding, we note that our supreme court has taken an ambiguous stance on the issue of whether need is to be considered in determining the existence of a de facto marriage. In Sappington, the supreme court addressed the issue of whether a couple could be considered to be in a resident, continuing conjugal relationship where they did not engage in sexual conduct. Sappington, 106 Ill. 2d at 462. The court distinguished an appellate court case holding that, without sexual conduct, there could be no finding of a de facto marriage, on the grounds that, in that case, the parties did not go out together socially or travel together, while, in Sappington, the parties lived in the same house alone for over two years, dated exclusively, and took vacations together (during which they shared motel rooms and expenses). Sappington, 106 Ill. 2d 456, distinguishing In re Marriage of McGowan, 84 Ill. App. 3d 609 (1980). The supreme court then reasoned as follows:

"Maintenance is predicated upon a need for support by [the receiving spouse]. [Citation.] We believe that when two people live together *** it is the husband-and-wife-like relationship which bears the rational relationship to the need for support, not the absence or presence of sexual intercourse. Therefore, once an ex-spouse paying maintenance has demonstrated that a husband-and-wife-like relationship does exist, it should be [i]ncumbent upon the maintenance recipient to demonstrate that the relationship *** is not the type of relationship which was intended by the legislature to justify the termination of the obligation to pay maintenance." Sappington, 106 Ill. 2d at 467.

The supreme court then quoted, without comment, two passages from appellate court cases: the above-quoted passage from Bramson, and the following passage from Halford:

" 'We believe that it was the intention of our legislature to provide for the termination of an ex-spouse's obligation to pay future maintenance whenever the spouse receiving the maintenance has entered into a husband-wife relationship with another, whether this be by legal or other means.' " (Emphasis added.) Sappington, 106 Ill. 2d at 467, quoting Halford, 70 Ill. App. 3d at 612.

The supreme court's decision in Sappington leaves ambiguous its stance on whether need is a factor to be considered in determining whether maintenance should be terminated under section 510(c) of the Act on the basis that the recipient is involved in a resident, continuing conjugal relationship. On one hand, the supreme court stated that the intention behind the de facto marriage rule is to terminate maintenance "whenever" a recipient has entered into a husband-wife relationship with another (Sappington, 106 Ill. 2d at 467), and the court relied on the nature of the couple's relationship (in light of several of the factors relied on herein) in holding that the lack of a sexual

relationship did not overcome the other factors (Sappington, 106 Ill. 2d at 466-67). On the other hand, after reaching its holding, the supreme court referred to the "need for support," and it quoted the above language from Bramson, which refers to the "consideration" that the cohabitation has affected the recipient spouse's need for support. Sappington, 106 Ill. 2d at 467. Though several of the cases cited above rely on Sappington in referring to the recipient spouse's need for support (e.g., Arvin, 184 Ill. App. 3d at 649-50), we find Sappington to be ambiguous on the point, and thus we instead rely on the plain language of the Act.

Though we agree with the ultimate holding of In re Marriage of Weisbruch, 304 Ill. App. 3d 99 (1999), that two cohabiting women may be considered de facto married,[2] we acknowledge our disagreement with some of its language as it applies to the de facto marriage issue discussed herein. The court there reasoned that "Illinois courts have routinely focused on the economic realities of the ex-spouse's new relationship rather than on its moral or legal implications." Weisbruch, 304 Ill. App. 3d at 105, citing Toole, 273 Ill. App. 3d at 611, Frasco, 265 Ill. App. 3d at 176-77, Halford, 70 Ill. App. 3d at 613, and Roofe, 122 Ill. App. 3d at 60. The court saw "the purpose of the statute [to be] to prevent the injustice of requiring the paying spouse to continue paying maintenance to an ex-spouse who uses the money to support someone else or is receiving support from someone else." Weisbruch, 304 Ill. App. 3d at 105. This language misstates the purpose of section 510(c) of the

---

[2]The holding in Weisbruch underscores the point that section 510(c) of the Act is invoked not by the recipient spouse's purpose in not getting legally married, but rather by whether the recipient spouse is in a relationship that meets the relevant factors, even if the spouse would be unable to enter into a de jure marriage.

Act, which was not enacted "to prevent the injustice of requiring the paying spouse to continue paying maintenance" when the receiving spouse does not need it (Weisbruch, 304 Ill. App. 3d at 105), but rather to "remedy the inequity created when the recipient spouse becomes involved in a husband-wife relationship but does not formalize the relationship" and thus avoids termination of maintenance due to remarriage (Sunday, 354 Ill. App. 3d at 189; see also Reeder, 145 Ill. App. 3d at 1017).

The Weisbruch court went on to note that terminating maintenance based on a conjugal relationship appeared "inconsistent" with the idea that the receiving spouse was still in need of maintenance, and it stated that the "same inconsistency appears in Sappington, which states that the most important factor is whether cohabitation affects the receiving spouse's need for support, yet provides for the complete termination of maintenance even where the receiving spouse's needs are not being completely met by his or her new partner." Weisbruch, 304 Ill. App. 3d at 106. The court justified this "inconsistency" by stating that the true inquiry is "whether the receiving spouse has formed a new relationship wherein the partners look to each other for support, not whether the support provided is in fact adequate to meet the receiving spouse's needs." (Emphasis in original.) Weisbruch, 304 Ill. App. 3d at 106.

First, we note that Sappington does not hold that the receiving spouse's need for support is "the most important factor" in determining if cohabitation justifies termination of maintenance. Weisbruch, 304 Ill. App. 3d at 106, citing Sappington, 106 Ill. 2d at 467-68. Even if, as discussed above, Sappington can be read as endorsing Bramson's proposition that need should be considered, nothing in Sappington gives any indication that need should be "the most important factor." That aside, the references to economic realities in Weisbruch contradict the principles we have laid out

above, which indicate that need is not a helpful factor in determining whether a couple carries on as if they were married. Terminating maintenance based on de facto marriage is not "inconsistent" with the idea of a recipient spouse's continued need. On the contrary, it is entirely consistent for a receiving spouse to remain in a position of financial need even after his or her maintenance has been terminated due to de facto marriage, because, as explained above, need is simply irrelevant to the determination of whether a de facto marriage exists.

The rationale of the de facto marriage rule is that a receiving spouse who is de facto remarried should be treated no differently from a receiving spouse who is de jure remarried. Because the spouse's need is not relevant in determining whether he or she is de jure remarried, it is not relevant in determining whether the spouse is de facto remarried. Thus, a recipient who is de facto married can no more be heard to claim a right to continue maintenance based on need than could a recipient spouse who enters into a formal, legal marriage. Here, the totality of the circumstances supports the trial court's finding of a de facto husband and wife relationship and is certainly not contrary to the manifest weight of the evidence. Thus, we hold that the trial court properly granted petitioner's petition to terminate maintenance.

Based on the foregoing, we affirm the judgment of the circuit court of Lee County.

Affirmed.

GROMETER, P.J., and CALLUM, J., concur.