2018 IL App (3d) 170289

Opinion filed April 3, 2018

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2018

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| | ) | of the 12th Judicial Circuit, |
| PASHA N. WALTHER, | ) | Will County, Illinois, |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | Appeal No. 3-17-0289 |
| and | ) | Circuit No. 14-D-1294 |
| | ) | |
| LEILANI E. WALTHER, | ) | Honorable |
| | ) | Kenneth L. Zelazo, |
| Respondent-Appellee. | ) | Judge, Presiding. |

JUSTICE HOLDRIDGE delivered the judgment of the court, with opinion.
Justice Schmidt concurred in the judgment and opinion.
Presiding Justice Carter dissented, with opinion.

**OPINION**

¶ 1     The petitioner, Pasha N. Walther, appeals from the circuit court's denial of his petition to

terminate maintenance. Pasha argues that the court failed to find that the respondent, Leilani E.

Walther, was cohabitating on a resident, continuing conjugal basis with Christopher Sawyer,

which justified terminating maintenance.

¶ 2                                                      FACTS

¶ 3     On December 14, 2014, the circuit court entered a judgment for the dissolution of the

marriage of Leilani and Pasha Walther. The judgment incorporated by reference the marital

settlement agreement entered by the parties. Section 4 of the agreement obliged Pasha to pay spousal maintenance to Leilani in the amount of $2500 per month for a period of 5 months and $3000 per month for a period of 91 months. Section 4.3 of the agreement stated Pasha's maintenance obligation would terminate "if Leilani cohabits with another person on a resident, continuing conjugal basis, in accordance with Section 510(c) of the Illinois Marriage and Dissolution of Marriage Act [(Act)] 750 ILCS 5/510(c)."

¶ 4    On April 28, 2016, Pasha filed a petition to terminate maintenance. The petition alleged Leilani had been in a dating relationship with Christopher since early 2015. In the summer of 2015, Leilani moved into Christopher's residence and continued to live with Christopher while maintaining a separate apartment.

¶ 5    At the hearing on the petition, Pasha called Leilani as an adverse witness. Leilani testified that the parties separated on September 1, 2013. In December 2013, Leilani reconnected with Christopher, a man that she had known since she was 15 years old. In March 2014, Leilani visited Christopher in Gretna, Louisiana. In total, Leilani made four trips to Louisiana to see Christopher in 2014. During the trips, she slept at Christopher's house.

¶ 6    On July 28, 2014, Pasha filed a petition for dissolution of marriage. At the time, Leilani had a relationship with Christopher; however, she "wouldn't call it dating." Leilani acknowledged that her relationship included sexual intercourse.

¶ 7    In October 2014, Pasha kicked Leilani out of the parties' residence in Plainfield, Illinois. Leilani moved back to Louisiana where she initially stayed with a friend until she was able to rent an apartment. On November 1, 2014, Leilani rented a one-bedroom apartment in Gretna. The apartment was located at 1615 Carol Sue Avenue, and it was approximately 2½ miles from Christopher's house. Initially, Leilani's apartment was sparsely furnished, and she slept on a

mattress on the floor. Leilani said the apartment was her residence, but she acknowledged that she had stayed at Christopher's house "at different times." Leilani denied staying at Christopher's house on "a regular and continuing basis." However, counsel for Pasha impeached Leilani's statement with her deposition testimony that she "began regularly sleeping" at Christopher's house in May 2015. Leilani slept at Christopher's residence "on a daily basis" during the months of August, September, October, and November 2015. While Leilani stayed at Christopher's house, she had a monogamous relationship with Christopher.

¶ 8      In addition to staying at Christopher's house, Leilani kept some of her clothing at Christopher's house and occasionally did her laundry there, washed Christopher's clothing, bought groceries for Christopher's household, stored groceries in Christopher's refrigerator, and prepared meals at the house. Leilani did not have a key to Christopher's house, but she freely entered and left the house through an unlocked back door.

¶ 9      On November 8, 2015, the parties' daughter, Ashley, moved to Louisiana to live with Leilani. After Leilani picked Ashley up at the airport, they drove to Christopher's house where Leilani had been staying for the past seven months. There, Leilani directed Ashley to the bedroom that she was to share with Christopher's daughter, Amber. At the time, Leilani shared a bedroom with Christopher.

¶ 10      After Ashley moved in, Leilani and Christopher went on trips to Biloxi, Mississippi, to attend concerts. On some of these trips, Leilani and Christopher spent the night in Biloxi while Ashley stayed at Christopher's house. Leilani split the cost of these trips with Christopher.

¶ 11      Between July 2015 and April 2016, Leilani occasionally cashed Christopher's business checks using her personal account. Leilani was otherwise unfamiliar with Christopher's business or personal finances.

3

¶ 12        According to Leilani, in 2016, she spent all the major holidays with Christopher, including Independence Day, Labor Day, Thanksgiving, and Christmas. However, Leilani denied living at Christopher's house.

¶ 13        Leilani explained that when she signed the marital settlement agreement she did not have legal representation and did not understand that living with someone on a resident, continuing conjugal basis, resulted in a *de facto* husband and wife relationship that would terminate Pasha's maintenance obligation. Leilani thought "living together was signing a lease together, getting a house together, not sleeping at somebody's house. I had my place where I stayed." Leilani acknowledged that "[f]or a small amount of time [she] did sleep at [Christopher's] house."

¶ 14        On February 4, 2016, Leilani posted on her Facebook page a photograph of Christopher, Ashley, Amber, and herself. The photograph shows Christopher with one arm around Leilani and his other arm around Ashley. In response to a friend's comment, Leilani posted "[a]nd an awesome family. We are so happy." Another of Leilani's friends commented "this is a beautiful blended family." Leilani responded "[w]e couldn't be happier. Lots of laughs around here, not to mention [Ashley] got a sister she always wanted."

¶ 15        In April 2016, Rhonda Sawyer, Christopher's sister who also lived in Christopher's house, told Leilani and Ashley to move out. Leilani was upset because her one-bedroom apartment did not have room for Ashley, and Ashley had developed a close relationship with Amber. Leilani said that her relationship with Christopher lasted for approximately 11 months.

¶ 16        On cross-examination, Leilani testified that she moved to Louisiana after the parties' divorce because she grew up in Gretna and felt that it was her home. In November 2014, after Leilani signed the lease for her apartment, Pasha came to Gretna to visit Leilani. Pasha stayed with Leilani in her apartment for approximately three days.

4

¶ 17    In November 2015, Pasha gave Leilani one day notice that he was sending Ashley to Louisiana to live with Leilani. Leilani said Pasha knew her apartment had only one bedroom. As a result, Leilani arranged for Ashley to stay at Christopher's house where Ashley could have a separate bedroom. After Ashley arrived in Louisiana, Leilani started looking for a two-bedroom apartment. In the five months that it took Leilani to locate a two-bedroom apartment, Ashley stayed at Christopher's house.

¶ 18    Leilani said that she and Christopher had a "dating relationship." During their relationship, Leilani maintained a separate checking account. Her checking account statements and utility bills were mailed to her apartment. Leilani used her apartment address on her driver's license, vehicle registration, and Ashley's school registration. Before Ashley moved to Louisiana, Leilani stayed at her apartment at times but "[n]ot a whole lot of times." Leilani kept her apartment because she did not intend to stay in her relationship with Christopher for the long term. Leilani noted that she never told anyone that she "loved" Christopher or intended to marry him.

¶ 19    On redirect examination, Leilani testified that in April 2016, after Rhonda told her to move out of Christopher's house, she sent a text message to Ashley that said "[d]on't say anything to dad or Amber, please. Rhonda is kicking us out. So when you get home tomorrow, you need to pack your stuff."

¶ 20    Pasha testified that he and Leilani were originally from Louisiana, but lived in Plainfield at the time of their divorce. In 2014, before Pasha filed for divorce, Leilani traveled to Gretna four times where she stayed with Christopher.

¶ 21    Following the divorce, Pasha had custody of Ashley. Pasha also mailed the maintenance checks to Leilani at 1615 Carol Sue Avenue, Gretna, Louisiana. Leilani never told Pasha that she

was living with Christopher or to mail the checks to Christopher's address. In November 2015, Ashley moved to Louisiana. At the time, Leilani was living at Christopher's house. Approximately six months later, Leilani and Ashley moved into a two-bedroom apartment.

¶ 22    In its ruling, the court said that it had heard the evidence, reviewed the documentary exhibits, and considered the supporting case law. The court found that it was required to consider the totality of the circumstances of the evidence presented to determine if there was a *de facto* husband and wife relationship. This included six nonexclusive factors: (1) the length of the relationship between the individuals alleged to be in a *de facto* husband and wife relationship, (2) the amount of time spent together, (3) the nature of the activities engaged in, (4) the interrelation of personal affairs, including finances, (5) whether they vacationed together, and (6) whether they spent holidays together. Specifically, the court said: "[w]hile evidence has been presented by the movant in the petition to terminate of numbers of these factors, I do believe, when looked at in the totality of the circumstances, I do not believe a *de facto* marriage has been put in place, and *** the petition to terminate maintenance is respectfully denied." Pasha appeals.

¶ 23                                          ANALYSIS

¶ 24    Pasha argues the circuit court's ruling was contrary to the manifest weight of the evidence because the record is replete with evidence that shows Leilani and Christopher cohabitated on a resident, continuing conjugal basis. Pasha contends the following facts establish that relationship:  Leilani (1) had a conjugal relationship with Christopher at the time Pasha filed for divorce, (2) slept at Christopher's residence on a daily basis from May to November 2015, (3) had free and unfettered access to Christopher's house, (4) stored and washed her clothes at Christopher's house, (5) purchased groceries for Christopher's family, (6) cooked for

6

Christopher's family, (7) moved her daughter into Christopher's house, (8) took overnight trips with Christopher, and (9) referred to a photograph of herself, Christopher, Amber, and Ashley as a "family."

¶ 25 Section 510(c) of the Act states "the obligation to pay future maintenance is terminated *** if the party receiving maintenance cohabits with another person on a resident, continuing conjugal basis." 750 ILCS 5/510(c) (West 2014). The payor spouse who seeks termination of their maintenance obligation has the burden of establishing that the receiving spouse is cohabiting with another. *In re Marriage of Susan*, 367 Ill. App. 3d 926, 929 (2006). To satisfy their burden, the payor spouse "must make a substantial showing that the former spouse is involved in a *de facto* husband and wife relationship with a third party." *In re Marriage of Thornton*, 373 Ill. App. 3d 200, 208 (2007).

¶ 26 To determine whether the petitioner has satisfied their burden, a court examines the totality of the circumstances and considers the following nonexclusive factors: "(1) the length of the relationship; (2) the amount of time spent together; (3) the nature of activities engaged in; (4) the interrelation of personal affairs (including finances); (5) whether they vacation together; and (6) whether they spend holidays together." *In re Marriage of Miller*, 2015 IL App (2d) 140530, ¶ 40. Each termination case turns on its own facts, and "just as no two relationships are alike, no two cases are alike." *Id.* On review, we will not disturb the circuit court's finding of a *de facto* husband and wife relationship unless that finding is contrary to the manifest weight of the evidence. *In re Marriage of Sunday*, 354 Ill. App. 3d 184, 189 (2004). The circuit court's finding is contrary to the manifest weight of the evidence where "the opposite conclusion is clearly evident or if the decision is unreasonable, arbitrary, or not based on the evidence." *Miller*,

7

2015 IL App (2d) 140530, ¶ 40. We begin by analyzing the evidence relevant to each of the six factors.

¶ 27    First, we look at the evidence of the length of Leilani's relationship with Christopher. Leilani testified that her relationship with Christopher lasted for approximately 11 months. However, this appears to be the period of the formal "relationship" as Leilani testified that she reconnected with Christopher in December 2013, started visiting and staying with Christopher in March 2014, stayed at Christopher's house on a daily basis between May and November 2015, moved her daughter into Christopher's house in November 2015, and was kicked out of the house in April 2016. Although Leilani testified that she stayed at Christopher's house on a daily basis until November 2015, the record shows that she had not moved out on November 8, 2015, the date Ashley moved in, because Leilani testified that she shared a bedroom with Christopher at that time. Leilani's testimony of the six month cohabitation period is further defeated by her April 2016 text message to Ashley that read "Rhonda is kicking *us* out." Leilani's use of a plural pronoun establishes that she too was living at Christopher's house in April 2016. Therefore, Leilani's relationship with Christopher lasted nearly two years and included nearly one year of cohabitation. These facts give the appearance of a *de facto* husband and wife relationship.

¶ 28    Second, we examine the evidence of the amount of time Leilani and Christopher spent together. The record indicates that Leilani spent a substantial amount of time with Christopher. Their time together began in 2014 when Leilani stayed with Christopher during her four visits to Louisiana. Then, in May 2015, Leilani slept at Christopher's house "on a daily basis." Leilani did not break down the number of hours per day that she spent with Christopher, however, her testimony that she prepared meals at Christopher's house, shared a bedroom with Christopher,

8

and assisted in cashing checks for Christopher's business creates the reasonable inference that Leilani spent a substantial portion of each day with Christopher.

¶ 29     Third, we consider the nature of the activities that Leilani and Christopher engaged in. Leilani testified that she had a monogamous sexual relationship with Christopher and shared a bedroom with Christopher. Leilani and Christopher also attended concerts together in Biloxi. Some of these trips included overnight stays. Leilani helped Christopher by cashing checks for his business, washing his laundry, purchasing groceries, and preparing meals for his household. Although Leilani did not have a key to Christopher's house, she had unfettered access. These activities give the appearance of a *de facto* husband and wife relationship. This appearance is furthered by Leilani's February 2016 post on Facebook. At that time, Leilani posted a photograph of Christopher and herself standing arm-in-arm with their daughters. In response to some friends' comments, Leilani described the group as a "family" and mentioned that her daughter "got a sister she always wanted." Leilani also commented "[w]e couldn't be happier. Lots of laughs around here." The photograph and comments confirmed that Leilani had formed a familial relationship with Christopher and his daughter and the group engaged in activities as a family.

¶ 30     Fourth, we review the evidence related to the interrelation of Leilani and Christopher's personal affairs, including finances. As indicated by our discussion of the third factor, Leilani had intermingled many aspects of her life with Christopher's life, including sharing a bedroom with Christopher, arranging for their children to live in the same bedroom, assisting with household chores, and referring to herself, Christopher, Ashley, and Amber as a family. *Supra* ¶ 29. The evidence establishes that the only aspects of Leilani's personal affairs that were not interrelated with Christopher were Leilani's finances, driver's license, vehicle registration, and

9

Ashley's school registration. Thus, Leilani had interrelated much of her personal affairs with Christopher's.

¶ 31    We next examine the fifth factor, whether Leilani and Christopher vacationed together. As discussed in relation to the couple's activities, Leilani and Christopher traveled together to Biloxi to attend concerts. *Supra* ¶ 29. Although these were not lengthy trips, Christopher and Leilani occasionally spent the night in Biloxi. Leilani's testimony that she and Christopher split the costs of the trips slightly decreases the appearance of a trip taken by a *de facto* marital couple, but it does not discredit the fact that they vacationed together as a couple. Therefore, these trips are vacations that evidence a *de facto* husband and wife relationship.

¶ 32    Finally, we review the evidence of the sixth factor, whether the couple spent holidays together. Leilani testified that she spent all of the major holidays with Christopher in 2016. However, this testimony conflicts with Leilani's statement that she and Ashley were kicked out of the house in April 2016 and her relationship with Christopher ended. After reviewing the record *in toto*, we find that Leilani's testimony indicated that she spent all major holidays with Christopher in 2015. This inference is validated by Leilani's testimony that she slept at Christopher's house "on a daily basis" from May to November 2015 and her text message to Ashley that established that she was still living at Christopher's house in April 2016. Leilani's May 2015 to April 2016 period of cohabitation with Christopher included the following holidays: Independence Day, Labor Day, Thanksgiving, and Christmas. Therefore, evidence of this factor furthers the appearance of a *de facto* husband and wife relationship.

¶ 33    After reviewing the totality of the circumstances and considering the six factors, we conclude that the vast majority of the evidence clearly establishes that Leilani cohabited with Christopher on a resident, continuing conjugal basis. 750 ILCS 5/510(c) (West 2014). Moreover,

the mere fact that Leilani's relationship with Christopher appears to end around the time that Pasha filed his petition to terminate maintenance does not refute the evidence that clearly shows that Leilani cohabitated with Christopher on a resident, continuing conjugal basis. Therefore, Pasha satisfied his burden of proof, and the circuit court's denial of the petition to terminate maintenance was contrary to the manifest weight of the evidence.

¶ 34                                    CONCLUSION

¶ 35        The judgment of the circuit court of Will County denying the petition to terminate maintenance is reversed. The cause is remanded with directions for the circuit court to determine the date at which Pasha's maintenance obligation terminated and to order a refund of any maintenance paid after that date.

¶ 36        Reversed and remanded with directions.

¶ 37        PRESIDING JUSTICE CARTER, dissenting:

¶ 38        I respectfully dissent from the majority's opinion in the present case. I would affirm the circuit court's judgment and hold Leilani and Christopher did not cohabitate on a continuing conjugal basis and the denial of Pasha's petition to terminate maintenance was not contrary to the manifest weight of the evidence.

¶ 39        I agree with the majority that our evaluation of the circuit court's denial of Pasha's petition to terminate maintenance is reviewed under the manifest weight of the evidence standard. However, in applying this standard, I would afford greater deference to the circuit court's fact and credibility findings. This level of deference is necessary "to preserve the primacy of the trial court's position in finding those unique facts *** concerning the existence of a *de facto* husband-wife relationship." *Sunday*, 354 Ill. App. 3d at 189. After all, the decision to grant a petition to terminate maintenance is highly fact-dependent, and the circuit court is in a far

11

superior position to weigh the credibility of the witnesses who testify before it and make fact-based determinations. *In re Marriage of Snow*, 322 Ill. App. 3d 953, 956 (2001).

¶ 40     The analysis of the majority tends to lose sight of the rationale behind terminating the payor spouse's maintenance obligation: the prevention of "the inequity created when the ex-spouse receiving maintenance becomes involved in a husband-and-wife relationship but does not legally formalize it." *In re Marriage of Herrin*, 262 Ill. App. 3d 573, 577 (1994). Pasha's evidence fails to support this presumption as Leilani's unrebutted testimony indicated that she never intended for her relationship with Christopher to be permanent or lead to marriage. Leilani's position is supported by the evidence that she maintained a separate apartment, occasionally lived at that apartment, did not commingle her finances with Christopher's, and did not have a key to Christopher's house. While this evidence could be viewed as a ruse to conceal a more permanent relationship, this would require fact and credibility determinations that must be made by the circuit court in its role as fact finder. Additionally, this evidence does not directly implicate the six factors reviewed by the majority, but those factors are "nonexclusive" and this evidence broadly supports the circuit court's finding that Leilani and Christopher's relationship was not a substitute for marriage. Moreover, I would find contrary to the majority's position that the evidence regarding the six factors does not show the existence of a *de facto* husband and wife relationship.

¶ 41     First, Leilani's testimony directly established that her relationship with Christopher lasted for 11 months. The majority contends that despite Leilani's direct testimony as to the length of her relationship with Christopher, the relationship was closer to two years. *Supra* ¶ 27. This conflict in Leilani's testimony presented a question of fact or a credibility determination for the circuit court to decide. The court's ruling indicates that it found the relationship to be of a shorter

12

term. I note that an 11-month relationship is shorter than many of the cases where courts have found a resident, continuing conjugal relationship. In *Snow*, a case relied on by Pasha, the spouse receiving maintenance payments lived with her boyfriend for approximately 18 months. *Snow*, 322 Ill. App. 3d at 955. Similarly, in *Herrin*, the maintenance receiving spouse testified that, at the time of the hearing, she had been in a monogamous sexual relationship with the same third party for 2½ years. *Herrin*, 262 Ill. App. 3d at 574-75. In both of these cases, the alleged resident, continuing conjugal relationship lasted for more than one year and was longer than Leilani's 11-month relationship with Christopher. The length of Leilani's relationship carries significant weight because it serves as a proxy to determine whether the new relationship was a substitute for the marital relationship. *Sunday*, 354 Ill. App. 3d at 189-90. Leilani's 11-month relationship with Christopher plus her stated intent that the relationship not be permanent show that this relationship was not a substitute for marriage.

¶ 42 Second, Pasha presented scant evidence of the amount of time that Leilani spent with Christopher during their relationship. At most, the record affirmatively shows Leilani and Christopher lived together on a daily basis between May and November 2015, but it does not detail the amount of time they spent together during this period. The majority's conclusion that the evidence indicates that Leilani and Christopher spent a substantial portion of each day together is undermined by evidence that Christopher operated a business outside of the home. This left less time for he and Leilani to spend together, even during the period that they cohabitated.

¶ 43 Third, little evidence was presented regarding the nature of the activities that Leilani and Christopher engaged in. At best, the record shows that the couple attended a few concerts in Biloxi, shared some meals, and had sexual intercourse. Apart from this, the record is unclear as

13

to the parties' daily activities. Contrary to the majority's finding, the record did not show that Leilani and Christopher together engaged in the household chores like washing laundry and preparing meals.

¶ 44    Fourth, Leilani's testimony established that she did not share financial accounts or information with Christopher, and she had her government registration documents sent to her personal apartment. The record shows that, at most, Leilani assisted Christopher's business by cashing checks using her personal account and then giving the cash to Christopher, but she knew nothing about his overall finances. Moreover, Leilani testified that her bank statements were mailed to the address of her apartment, which indicated that Christopher had limited knowledge of Leilani's financial information.

¶ 45    Fifth, Leilani's testimony established that she and Christopher did not take lengthy vacations together, but they occasionally spent the night in Biloxi. The record is unclear as to the number of trips Leilani and Christopher took together, and consistent with their separate finances and uncharacteristic for *de facto* married couple, Leilani and Christopher split the costs of these trips.

¶ 46    Finally, Leilani testified that she spent all of the major holidays with Christopher in 2016. This statement tends to contradict Leilani's testimony that her relationship lasted approximately 11 months and Rhonda kicked her out of the house in April 2016 as the majority of these holidays occurred after this date. Potentially, as the majority notes, Leilani misstated the year of the holidays. However, this presented a question of fact or credibility for the circuit court to decide.

¶ 47    Considering the totality of the circumstances, I would find that the evidence of each of these factors establishes that Leilani and Christopher's relationship either did not attain a level of

14

permanence sufficient for the court to find that it was a substitute for marriage or implicates a credibility determination or question of fact for the circuit court to decide. As a court of review, I would defer to the circuit court's fact and credibility determinations and find them to be readily supported by the record. Overall, I would affirm the circuit court's ruling and hold its denial of Pasha's petition to terminate maintenance was not contrary to the manifest weight of the evidence.