NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 190864-U

NO. 4-19-0864

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF LORI A. BLUE, | ) | Appeal from the |
| Petitioner-Appellee, | ) | Circuit Court of |
| and | ) | Morgan County |
| WILLIAM F. BLUE, | ) | No. 11D109 |
| Respondent-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jeffery E. Tobin, |
| | ) | Judge Presiding. |

JUSTICE TURNER delivered the judgment of the court.
Presiding Justice Steigmann and Justice Cavanagh concurred in the judgment.

**ORDER**

¶ 1   *Held:*   The trial court did not err in denying respondent's petition to terminate
maintenance.

¶ 2         On December 7, 2018, respondent William F. Blue filed a petition to terminate

maintenance, which he was required to pay to petitioner Lori A. Blue pursuant to a marital

settlement agreement incorporated into the trial court's dissolution judgment. William alleged

Lori was cohabiting with an adult man, Anthony Garman, on a resident, continuing, conjugal

basis. On November 19, 2019, the trial court denied William's petition, finding no *de facto*

husband and wife relationship existed between Lori and Garman. William appeals, arguing the

trial court's determination was against the manifest weight of the evidence.

¶ 3                        I. BACKGROUND

¶ 4         On June 12, 2015, the trial court entered a dissolution judgment in this case. A

marital settlement agreement between Lori and William, which included a requirement William pay Lori $1200 per month as and for maintenance, was incorporated into the judgment. Pursuant to the agreement, William's obligation to pay maintenance would end if Lori cohabited with another person on a resident, continuing, conjugal basis. This part of the agreement corresponds with section 510(c) of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/510(c) (West 2014)). On December 7, 2018, William filed a petition to terminate maintenance, alleging Lori was cohabiting with Garman.

¶ 5        The trial court held a hearing on William's petition to terminate maintenance on October 18, 2019. Richard Evans, a private investigator, testified he conducted surveillance on Lori's residence on West Lafayette Avenue in Jacksonville in the fall of 2018. He was instructed to look for a Dodge Durango belonging to Garman around the residence. Evans conducted periodic surveillance on Lori's home on September 4, 6, 12, 13, 17, 18, 19, 20, and 21, 2018. On September 4, he did not observe Garman's vehicle. On September 6, 2018, Garman's Durango was present at 4:51 a.m. On September 12, 17, 18, 19, and 20, Garman's vehicle was at Lori's house after 10 p.m. and before 6 a.m. the next morning. Evans also did periodic surveillance on Lori's residence from November 4 to November 9, 2018. On November 4, 5, 6, 7, and 8, Garman's vehicle was present at Lori's after 9 p.m. and before 6 a.m. the next morning. While surveilling the property, Evans went through some of Lori's trash. The only item he found linking Garman to Lori's property was an empty pill bottle with Garman's name but a different address.

¶ 6        Anthony Garman, 54, testified he lived in Jacksonville. He was currently single, had been married twice, and had three children. He had lived with his mother since 2014 and neither owned nor leased a residence. He and Lori met at Dot Foods where he worked from

March to September in 2014.  He and Lori started communicating via Facebook in the summer of 2015.  At that time, Lori was living on Mound Avenue.  They started seeing each other infrequently beginning in August 2015.  When he and Lori would meet, they would cook out and eat dinner.  He stayed at her house a couple of nights in the fall of 2015 but did not sleep with Lori.  They began occasionally having sexual relations after January 1, 2016.  This continued up to the time of the maintenance termination hearing.

¶ 7          During this period, Garman and Lori occasionally did things at Lori's, including eating together, yardwork, and small projects.  Garman sometimes spent the night at Lori's, and on some of those occasions, they had sexual relations.  They would occasionally go out for dinner together or shopping.  Sometimes Garman would shower at Lori's home if he was hot and sweaty after working outside.

¶ 8          When Lori moved in 2017, Garman helped move her furniture and continued to assist her with yard work and small jobs around the house.  He stopped mowing her yard in April 2018 because he broke his leg and was unable to do any physical labor in April, May, June, and July 2018.  Lori started mowing the yard but eventually hired someone to mow.  Garman spent a lot of time at Lori's new house helping paint, hanging blinds, and working on other small projects.  If he worked late into the night at Lori's house, he would sleep there.

¶ 9          Garman also helped Lori's father, who also lived in Jacksonville, around his house and drove him to doctor's appointments.  Garman spent Thanksgiving and Christmas 2018 with Lori, her father, and her stepmother, and some of Lori's children. For the Fourth of July, Lori met Garman and his children (ages 16, 18, and 21) at Nichols Park in Jacksonville to watch fireworks.  Garman's children had spent time at Lori's house for cookouts when they visited Garman because he did not have enough money to take everyone out to dinner.  Garman went to

a family reunion for Lori's family in August 2019.

¶ 10        Garman testified he had driven Lori to the St. Louis airport to avoid long-term parking when she traveled and rode with Lori to pick up relatives flying into St. Louis. They also drove to Cincinnati to bring Lori's stepmother back to Jacksonville.

¶ 11        According to Garman, he and Lori had never dated and did not live together. He did testify they were close friends and he cared about her. Since 2014, he had lived with and helped take care of his mother, who had medical problems. Garman denied moving any of his personal belongings, clothes, or toiletries into Lori's house. He testified he and Lori had no joint accounts or investments together and did not loan each other money. They had a mutual understanding their relationship was not going to go any further than friends who occasionally had sex. He and Lori never discussed living together, and he had no intention of moving in with Lori. In early 2019, after Garman's mother's health problems increased, he and Lori did not spend as much time together.

¶ 12        Lori, 57, testified she and Garman spent a little time together in the fall of 2015. Beginning in 2016 and continuing through 2019, she and Garman infrequently had sexual relations. During this same period, Garman occasionally spent the night at her home. In October 2017, she moved to West Lafayette Avenue in Jacksonville. Garman installed blinds and painted and spent about 10 nights at her home at the time. Garman also helped her with mowing and landscaping work at the house. He occasionally had meals there.

¶ 13        Lori denied dating Garman or anyone else. She described their relationship as friends "with benefits." She testified her relationship with Garman had peaked for the time being. They had not commingled their household goods or their bank accounts, loaned each other money, or vacationed together.

¶ 14        William, 59, testified he lived about three blocks from Lori's home on West Lafayette Avenue. He frequently saw Garman's Durango at Lori's house late at night and in the morning. In the spring of 2018, he saw the vehicle at Lori's two nights per week. Later in the summer, the Durango was at Lori's more nights than not. He made contemporaneous notes of when he saw the Durango at Lori's house in September and November 2018. According to his notes, the Durango was at Lori's house on the following dates and times: September 3 at 8:46 p.m.; September 6 at 9:52 p.m.; September 8 at 12:30 a.m. and 4 p.m.; September 9 at 12:19 a.m., 4:51 p.m., and 8:10 p.m.; September 10 at 6:46 p.m. and 8:26 p.m.; September 11 at 9:09 p.m.; September 12 at 9:31 p.m.; September 13 at 6:02 and 9:10 p.m.; September 14 at 10:09 p.m.; September 15 at 7:20 a.m.; September 16 at 12:10 a.m. and 9:50 a.m., 4:54 p.m., 7:15 p.m., and 9:55 p.m.; September 17 at 10:24 p.m.; September 18 at 9:49 p.m.; September 19 at 9:27 p.m.; September 20 at 5:17 p.m. and 9:41 p.m.; September 22 at 1:10 a.m., 7:47 a.m., and 9:35 p.m.; September 23 at 9:45 a.m. and 4:55 p.m.; September 24 at 10:38 a.m.; September 25 at 7:48 p.m.; September 26 at 9:51 p.m.; September 27 at 7:41 p.m.; September 28 at 1:35 a.m.; and September 29 at 10:13 p.m.

¶ 15        He also drove by Lori's house in October and saw Garman's Durango but stopped taking notes because he believed he had enough information to establish a continuous conjugal relationship. He began taking notes again in November 2018 and saw the Durango at Lori's house on the following dates and times: November 12 at 9:55 (a.m. or p.m. not indicated); November 15 at 8:48 (a.m. or p.m. not indicated); November 16 at 9:02 p.m.; November 17 at 7:53 a.m.; November 18 at 7:11 p.m.; November 19 at 9:22 p.m.; November 21 at 7:38 a.m. and 9:09 p.m.; November 23 at 9:44 p.m.; November 25 at 9:50 a.m.; and November 25 at 10:19 p.m. After filing his petition to terminate maintenance in December 2018, he continued to see

the Durango at Lori's house at least two times per week.

¶ 16        On November 12, 2019, in a written order, the trial court noted it had considered the length of the relationship between Lori and Garman, the time they spent together, the activities they engaged in, the interrelation of their personal affairs, and time they spent together on vacation and holidays. The court noted in the order, "All witnesses appeared to be credible as to the facts." Ultimately, the court concluded, "The Court finds that there are insufficient facts to establish a resident, continuing, conjugal basis as to the relationship in question. The Court must DENY the petition as there is no *de*[]*facto* husband and wife relationship."

¶ 17        This appeal followed.

¶ 18                                II. ANALYSIS

¶ 19        On appeal, William argues the trial court erred in denying his petition to terminate maintenance. According to William, the evidence overwhelmingly established Lori and Garman were in a *de facto* husband-and-wife relationship, which ended his obligation to pay maintenance.

¶ 20        We note Lori failed to file a brief with this court. Our supreme court has stated a reviewing court should not be compelled to act as an advocate for an appellee or required to search the record to sustain a trial court's judgment. *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133, 345 N.E.2d 493, 495 (1976). However, it may do so if justice requires. *Talandis*, 63 Ill. 2d at 133, 345 N.E.2d at 495. The supreme court also stated:

> "[I]f the record is simple and the claimed errors are such that the court can easily
> decide them without the aid of an appellee's brief, the court of review should
> decide the merits of the appeal. In other cases if the appellant's brief
> demonstrates *prima facie* reversible error and the contentions of the brief find

support in the record the judgment of the trial court may be reversed." *Talandis*, 63 Ill. 2d at 133, 345 N.E.2d at 495. The record with regard to this issue is simple, and we will decide the issue on the merits.

¶ 21 The reason maintenance can be terminated in situations involving *de facto* marriages is to prevent "the inequity created when the ex-spouse receiving maintenance becomes involved in a husband-and-wife relationship but does not legally formalize it." *In re Marriage of Herrin*, 262 Ill. App. 3d 573, 577, 634 N.E.2d 1168, 1171 (1994). The party seeking to terminate his or her obligation to pay maintenance has the burden of establishing the party receiving maintenance is in a *de facto* husband and wife relationship with a third party. *In re Marriage of Susan*, 367 Ill. App. 3d 926, 929, 856 N.E.2d 1167, 1171 (2006).

¶ 22 Based on the evidence in this case, the trial court determined the evidence presented was insufficient to establish a resident, continuing, and conjugal relationship or a *de facto* husband and wife relationship. This court will not disturb a trial court's denial of a petition to terminate maintenance unless the trial court's decision is against the manifest weight of the evidence. A decision is against the manifest weight of the evidence if the opposite conclusion is clearly evident or the decision is unreasonable, arbitrary, or not based on the evidence presented. *In re Marriage of Walther*, 2018 IL App (3d) 170289, ¶ 26, 110 N.E.3d 221. A decision whether to grant a petition to terminate maintenance is heavily fact dependent. *Walther*, 2018 IL App (3d) 170289, ¶ 26. The trial court is in a much better position than this court to judge the credibility of witnesses and make fact-based determinations. *In re Marriage of Snow*, 322 Ill. App. 3d 953, 956, 750 N.E.2d 1268, 1270 (2001). In this case, the trial court found the testimony of all the witnesses credible.

¶ 23 In determining whether a relationship between two individuals amounts to a

*de facto* marriage, a court will consider the following non-exclusive factors: (1) the length of the relationship, (2) the amount of time the individuals spent together, (3) the nature of the activities the couple engaged in together, (4) the interrelation of their personal affairs, (5) whether the individuals vacation together, and (6) whether they spend holidays together. *Walther*, 2018 IL App (3d) 170289, ¶ 26. A trial court should examine the totality of the circumstances in a case. *Susan*, 367 Ill. App. 3d at 929, 856 N.E.2d at 1171. No single factor shall control a court's decision. *Susan*, 367 Ill. App. 3d at 930, 856 N.E.2d at 1171. Every termination case turns on its own unique facts, and no two cases are alike. *Susan*, 367 Ill. App. 3d at 930, 856 N.E.2d at 1171.

¶ 24        William tries to compare the situation in this case with the situations in *Herrin*, *Susan*, *Snow*, and *Walther* where maintenance was terminated. However, those cases are distinguishable from the situation in this case.

¶ 25        In *Snow*, the woman receiving maintenance had a man living in her house for a year and a half. The trial court found the woman and the man were having sexual relations three to four times a week during this period. The two also socialized two or three times a month for dinner, a movie, or drinks. *Snow*, 322 Ill. App. 3d at 955-56, 750 N.E.2d at 1269-70.

¶ 26        In *Walther*, the woman receiving maintenance had traveled to Louisiana four times to visit a man, stayed at his house, and had sexual relations. She then moved to Louisiana and began staying at the man's house on a regular and continuing basis. The woman's daughter moved to Louisiana approximately six months later and also stayed at the man's home with her mother. The woman lived with the man for almost a year before the man's sister kicked the woman and her daughter out of the man's home. *Walther*, 2018 IL App (3d) 170289, ¶¶ 3-22.

¶ 27        Unlike the situations in *Snow and Walther,* both Lori and Garman testified they

did not live together. The trial court found their testimony credible.

¶ 28       In *Herrin*, the boyfriend of the woman receiving maintenance was at the woman's house on a near constant basis other than after 10:30 at night when he left to sleep at a home he owned which had no gas, heat, or hot water service. The couple had been romantically involved for 2½ years and had discussed getting married but decided against it so the woman would not lose her maintenance. The couple also vacationed and spent holidays together. *Herrin*, 262 Ill. App. 3d at 574-75, 634 N.E.2d at 1169-70. Unlike in *Herrin*, Lori and Garman testified they did not spend all their time together and had not put off marriage so Lori could continue to receive maintenance. In fact, according to Lori, their relationship had peaked.

¶ 29       In *Susan*, the woman receiving maintenance and the man she had been involved with for over two years had their own homes. However, the trial court found they spent most evenings together, including overnight, at one of their homes. *Susan*, 367 Ill. App. 3d at 928, 856 N.E.2d at 1170. Again, the situation here is distinguishable because Lori and Garman were not spending every night together.

¶ 30       Regardless of any similarities that might exist between this case and *Herrin*, *Susan*, *Snow*, and *Walther*, the trial court in this case denied William's petition to terminate maintenance. We will only disturb the court's ruling if it was against the manifest weight of the evidence. When considering the totality of the circumstances in this case, the trial court's decision was not against the manifest weight of the evidence.

¶ 31       Lori and Garman had a long-term close relationship. However, they both denied they were even dating. While they both acknowledged having sexual relations, they both testified it was infrequent. Lori described their relationship as friends "with benefits." While Lori and Garman testified Garman would sometimes spend the night at Lori's residence, they

each testified they did not live together and Garman kept nothing at Lori's house.

¶ 32    The evidence does show Lori and Garman spent a significant amount of time together in September and November of 2018, with Garman spending many nights at Lori's house.  However, even during this period, the private investigator found nothing in Lori's trash indicating Garman was living with Lori.  The only item the private investigator found with Garman's name was a pill bottle with an address different from Lori's.

¶ 33    Lori and Garman both testified they had no joint accounts or investments, did not financially support each other, and did not vacation together.  In fact, it appears the farthest they ever traveled together was to Cincinnati to drive Lori's stepmother back to Jacksonville.

¶ 34    William argues Lori's claim she and Garman are only friends "with benefits" is not credible in light of the overwhelming evidence in this case.  However, as we have noted throughout this decision, the trial court found Lori and Garman's testimony credible.  The trial court did not have to share William's assessment of Lori and Garman's relationship.  Based on the evidence in this case, the trial court's ruling was not against the manifest weight of the evidence.

¶ 35                    III. CONCLUSION

¶ 36    For the reasons stated, we affirm the trial court's judgment.

¶ 37    Affirmed.