2022 IL App (3d) 210026

Opinion filed January 13, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| | ) | of the 10th Judicial Circuit, |
| AMY CHURCHILL, | ) | Tazewell County, Illinois. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | Appeal No. 3-21-0026 |
| and | ) | Circuit No. 16-D-397 |
| | ) | |
| JOHN CHURCHILL, | ) | |
| | ) | Honorable Lisa Y. Wilson, |
| Respondent-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE SCHMIDT delivered the judgment of the court, with opinion.
Justices Daugherity and Holdridge concurred in the judgment and opinion.

**OPINION**

¶ 1        Respondent, John Churchill, filed a second petition to terminate maintenance. He alleged

that petitioner, Amy Churchill, engaged in a *de facto* marriage with another man. The trial court

denied the petition. John appeals. We reverse.

¶ 2                                I. BACKGROUND

¶ 3        As stated above, this is the second petition to terminate maintenance filed by John. The

first petition alleged the same basis for terminating maintenance as the petition at issue in this case.

Both petitions alleged that John's former wife, Amy, cohabitated with her boyfriend, Jared Fogle.

The trial court denied the first petition, and this court affirmed (*Churchill I*). See *In re Marriage of Churchill*, 2019 IL App (3d) 180208. The second petition, which is the subject of this appeal, involves some of the facts presented in the first appeal.

¶ 4                                                    A. *Churchill I*

¶ 5          Amy and John were married on March 27, 1999. They had two children: Grant, born September 7, 1999, and Luke, born October 18, 2002. Amy filed a petition for dissolution of marriage on September 27, 2016. The trial court granted Amy temporary relief in February 2017. It awarded her temporary monthly child support of $6040, maintenance of $5000, and entered an order of protection. The court appointed a guardian *ad litem* (GAL) to represent the children.

¶ 6          John filed a petition to terminate temporary maintenance in October 2017. He alleged Amy cohabitated with her boyfriend, Jared. In December 2017, a trial took place on John's petition to terminate maintenance.

¶ 7          Amy testified, as follows. She met Jared in November 2016. She planned to see him with a group of friends on New Year's Eve 2016 but cancelled because of illness. Jared visited her at the hospital in January 2017. They went on their first date on Valentine's Day 2017 and have engaged in sexual intercourse since February 2017. Amy estimated that Jared spent the night at her house approximately seven times between February and April 2017, with the longest period being Friday through Sunday. Jared kept a sweatshirt and a pair of slides at the marital house and slides at her rental place on North Morton Avenue. He helped move her outdoor furniture from the house on Tara Trace to the North Morton Avenue house, but she hired movers for the majority of her items.

¶ 8          Amy spent a lot of time with Jared. They went to the movies once and bowling several times with her children. She and Jared also went to the casino a few times. Jared helped her son

with his Spanish homework. Jared also attended her sons' sporting events. He used the grill at her house at her request on two occasions and took out the trash twice. He mowed and edged the lawn once. Jared washed his clothes at her house from time to time and put up a shelf for her son, but he did not assist her with household chores. She accepted packages for him delivered to her house, including several addressed to Amy Fogle. Amy explained that Jared used Amy Fogle as a code so she would know to wait to open the package until he was with her. She vacationed in Las Vegas with Jared to celebrate his birthday. She paid her share of the trip. They also traveled to Macomb for family gatherings. She bought Jared a ring when his grandfather died, but he was uncomfortable with it because of its symbolism. She and Jared had not discussed marriage. She believed that Jared may not be in her life forever. Amy acknowledged that Jared would likely move back to Texas and their relationship would end. She did not want to marry again.

¶ 9        Jared testified. He co-owned and operated a hail damage repair business with his brother. The work required him to move from place to place. He worked in Morton from November 2016 to April 2017. Jared moved the business to Canton in April 2017, staying there until June 2017, when he moved the business to Iowa. In October 2017, he moved the business to Missouri. His permanent home address was in Texas. His time in Morton was always meant to be temporary. While working in Morton, Jared set up an office and converted a room there into living quarters. Amy visited him there for lunch on occasion. Although he spent a few nights at Amy's house, he stayed primarily at his converted living space. He parked his truck in the garage at the Tara Trace house three or four times. After Amy moved to North Morton Avenue, he stayed there two or three nights each month. He never had a key to either residence. He did not keep a toothbrush at Amy's house. He had items delivered to Amy's house because he did not want them left unattended at the business.

¶ 10    The GAL testified that the children told her Jared did not live with them but spent four days at their house approximately every other weekend. The children treated Jared as a guest. One son found the idea of his mother marrying Jared humorous and said his relationship with his girlfriend was more serious than Amy and Jared's relationship. He called the ring Jared gave Amy a mother's ring and not a promise ring.

¶ 11    A sales associate from Rogers and Holland testified that Jared and Amy were authorized users on each other's account at the store. Jared used Amy's address when he bought her a ring. Amy bought Jared a ring described as a wedding band.

¶ 12    A private investigator hired by John testified that he began investigating Amy in February 2017 to determine John's claims of cohabitation. He conducted surveillance of Amy's house and Jared's business. He could not say that Jared ever spent the night at Amy's house.

¶ 13    An employee of John's who passed the marital house on her way to work testified that she had seen a black truck at the house between 7:30 and 8 a.m. in October 2016 but could not identify it as Jared's truck.

¶ 14    Amy's father testified that he spent time at Amy's house in the fall of 2016 and occasionally spent the night. He drove a black Yukon.

¶ 15    After hearing the evidence, the trial court entered an order denying John's petition to terminate temporary maintenance. The court awarded Amy permanent maintenance in the amount of $10,000 per month.

¶ 16    John appealed. He argued that the trial court erred when it denied his petition to terminate maintenance and also in awarding Amy permanent maintenance. This court rejected John's arguments and affirmed. *Id.*

¶ 17                                    B. *Churchill II*

¶ 18          On January 31, 2020, John filed a second petition to terminate maintenance, which is the subject of this appeal. The petition, again, alleged that Amy cohabitated with Jared and engaged in a *de facto* marriage.

¶ 19          On August 24, 2020, the cause proceeded to a trial. Amy testified that she loved Jared. She did not plan to end her relationship with him. She did not get engaged to Jared, and she had no plan to marry him. Their relationship remained long-distance due to Jared's frequent out-of-state travel for work. She visited him several times at his out-of-state work locations. Jared returned to Morton several times between jobs and stayed at Amy's home. Jared also stayed in his recreational vehicle (RV) when he returned to Morton. Jared and Amy spoke over the phone daily when Jared was out of state. When asked, "My question was you either talk to [Jared] on the phone or you're with him every day really since the last trial in 2017, fair?" Amy answered, "Yeah. We have had a long distance relationship so yes." Amy also testified, "[i]f he was working close by, he would come on the weekends if he could every other weekend or whenever." Jared parked his truck, RV, and trailer on Amy's driveway and in her garage. Jared had access to Amy's home through the garage door keypad. Amy did not believe Jared ever went inside her home by himself.

¶ 20          Jared testified that his permanent address is his parents' home in Goldthwaite, Texas. He occasionally had mail sent to Amy's home. He lived in his RV, which he used to travel to work locations. He parked the RV on Amy's driveway "a time or two." In 2018, when he finished work in Rockford, Illinois, he returned to Morton, Illinois. He parked his RV on Amy's driveway for a week when he and Amy traveled to Chicago. He spent nights at Amy's home, but he claimed he usually stayed in his RV at a nearby RV park.

¶ 21 Jared also owned a white Dodge Ram. He parked this car in Amy's garage on occasion. He did not believe he ever went inside Amy's home in her absence. He drove Amy's vehicle a handful of times. She drove his vehicle maybe once or twice. He also owned a black truck, which he sold to Amy's father. Amy's father gave the truck to Luke as a birthday gift.

¶ 22 Since July 23, 2020, Jared spent some nights at Amy's home and drove straight to work the next morning. Amy accompanied him on the drive to work some mornings. He also drove straight to Amy's house after work. Occasionally, Amy visited Jared for lunch.

¶ 23 Jared loved Amy and her children. He wanted children of his own, but not with Amy. He and Amy never discussed their exclusivity in dating. He no longer had a physical attraction to Amy. He thought their relationship would end, but he did not want to abandon her due to the litigation in this case. Jared installed dating applications on his phone, which he used "on and off." He began speaking to his ex-girlfriend. Jared did not say whether he dated women he met through dating applications. He also did not say whether he began dating his ex-girlfriend.

¶ 24 According to Jared, he worked in Texas in 2020 and spent a few months at his parents' home in Texas during the COVID pandemic. He returned to Illinois in July 2020 for work.

¶ 25 Jared preferred to live in Texas. When asked, "How come after every job site is complete you return to Morton, Illinois?" Jared responded, "I do what's convenient for me at the time, so I'm not sure what instance you're talking about." Counsel followed up, "Sure. Well, the seven or eight places you've been in the past two years, after every one of those you returned to, right to Morton, Illinois?" Jared answered, "Okay."

¶ 26 As to the activities Jared and Amy participated in, Jared's and Amy's testimony established that since April 5, 2018 (the date the first petition to terminate maintenance was denied), Amy and Jared went to a bowling alley, movies, Top Golf, concerts, comedy shows, Kartville, the

Caterpillar Museum, and dinners. Jared went with Amy and Luke to the Mayo Clinic. He attended a Chicago Bears game with Amy and her children. He went to a Dallas Cowboys game with Luke and Amy in Texas. Jared purchased tickets to the game as a present for Luke's birthday. Jared also attended Luke's sporting events. Jared went with Amy and her children to Six Flags. In 2019, Jared traveled with Amy and the family to Missouri for Grant's military send-off and traveled to San Diego for Grant's military graduation. Jared and Amy shared a hotel room on both occasions. Jared attended Grant's birthday weekend in Chicago, where they went on a helicopter ride around the city and went to Top Golf.

¶ 27 As for vacations, Jared's and Amy's testimony established that in September 2019, Jared traveled with Amy to Missouri to attend Grant's military send-off. In December 2019, Jared and Amy traveled to San Diego for Grant's military graduation. On May 4, 2019, Jared and Amy went on a weekend trip to Louisville, Kentucky, and French Lick, Indiana, for the Kentucky Derby and also went to a casino. They made several weekend trips to Chicago. Amy traveled to Colorado to visit Jared. In October 2019, they traveled to Minnesota to take Luke to the Mayo Clinic. They spent the weekend there and went to the Mall of America. Amy visited Jared in St. Charles, Missouri. In October 2019, Jared and Amy went to Texas for Luke's birthday. Jared and Amy also went to Texas to celebrate Thanksgiving with Jared's family in 2019.

¶ 28 With respect to holidays, their testimony established that the two celebrated their birthdays together. They spent Christmas 2018 and 2019 together. They also spent Thanksgiving together in 2018 and 2019. Jared attended both Grant's and Luke's birthday parties. Jared and Amy spent New Year's together in 2019 and 2020.

¶ 29 Regarding the ring Amy purchased for Jared, he testified that he no longer wore it. He believed the litigation in this case ruined the symbolism of the ring (remembrance of his

grandfather). A photograph of Jared at Grant's 2018 high school graduation party showed Jared wearing the ring on his ring finger. Another photograph showed Jared wearing the ring on his left ring finger at Grant's birthday in 2019. Jared wore the ring on his left ring finger in a photograph from Grant's military send-off in St. Louis in September 2019. Jared also wore the ring when they traveled to Texas for Luke's birthday. Jared could not remember if he wore the ring in 2020. Jared wore the ring because he knew John would not like it. Amy testified that Jared "wears [the ring] a lot and then there's a lot of times that he doesn't wear it." Amy also testified that Jared usually wears the ring around her.

¶ 30        Jared's and Amy's testimony established that they shared some household chore responsibilities during their relationship. Amy testified that Jared may have gone grocery shopping with her when he was in town. There is no evidence as to how many times this happened or that they shared the costs of the groceries. Jared cooked at Amy's home. He did not testify to how many times that occurred or whether he cooked for anyone other than himself. He used the grill at Amy's house twice. Jared assisted with edging the yard and mowing the lawn on one or two occasions. Otherwise, Amy had hired help to take care of the lawn. Jared shoveled and patted down the grass on Amy's lawn once to repair the damaged caused by his brother driving over the grass. Jared may have taken out the garbage for Amy, but he did not typically take the garbage out to the street. Jared also used a blower to clear debris from the sidewalk and porch of Amy's home.

¶ 31        A private investigator testified for John. She began her investigation on June 24, 2018. Her investigation ended August 5, 2020. During that time, she made 115 visits to Amy's home address in Morton, Illinois. Throughout her two-year investigation, she made the following observations. Jared frequently parked his white truck, RV, and trailer on Amy's driveway. Jared also parked his white truck in Amy's garage. Jared went inside Amy's home without Amy present on about eight

or nine occasions. The investigator saw a pattern with Jared parking his truck at Amy's home from August 6, 2018, to November 2018. Based on the presence of Jared's vehicle, she believed he stayed at Amy's home for approximately 75% of that period. Jared left in November to work in Colorado. She believed that Jared always returned to Morton, Illinois, when he finished working out-of-state.

¶ 32      On cross-examination, the investigator testified that in June 2018, she believed Jared would spend 3½ days in Rockford and the remainder of the time at Amy's home. When Jared moved his business from Rockford to Morton, she observed a white trailer appear at Amy's home. She did not perform surveillance on Amy's home from April 4, 2019, to December 15, 2019, and January 27, 2020, to May 2, 2020. She based her conclusion on whether Jared was at Amy's house on the presence of Jared's white truck in Amy's driveway.

¶ 33      After hearing the evidence, the trial court denied John's petition to terminate maintenance. John appeals.

¶ 34                                    II. ANALYSIS

¶ 35      On appeal, John contends the trial court erred in denying his section 510(c) petition to terminate maintenance. Section 510(c) provides that "the obligation to pay future maintenance is terminated *** if the party receiving maintenance cohabits with another person on a resident, continuing conjugal basis." 750 ILCS 5/510(c) (West 2020). The party seeking the termination of maintenance has the burden of establishing that the receiving spouse is cohabiting with another. *In re Marriage of Susan*, 367 Ill. App. 3d 926, 929 (2006). In determining whether the petitioner met the burden, a court looks to the totality of the circumstances and considers the following nonexhaustive list of factors: (1) the length of the relationship, (2) the amount of time spent together, (3) the nature of activities engaged in, (4) the interrelation of personal affairs (including

finances), (5) whether they vacation together, and (6) whether they spend holidays together. *Id.* Each termination case turns on its own set of facts; just as no two relationships are alike, no two cases are alike. *Id.* at 930. This court will not upset the trial court's ruling on a petition to terminate maintenance based on the existence of a *de facto* marriage unless that ruling is against the manifest weight of the evidence. *Id.* at 929-30.

¶ 36    First, we consider the length of Amy's relationship with Jared. At the time of the hearing on the second petition to terminate maintenance, Amy and Jared engaged in a monogamous relationship for almost 3½ years. Although Amy and Jared did not believe their relationship would continue, they offered the same testimony at the hearing on the first petition to terminate maintenance. Yet, their relationship continued with no sign of it ending. In addition, while Jared installed dating applications on his phone and spent time with his ex-girlfriend, there is no evidence Jared actually used the applications to meet other women or that he began dating his ex-girlfriend again. These facts favor a finding of a *de facto* husband-and-wife relationship.

¶ 37    Second, we consider the amount of time Amy and Jared spent together. The evidence shows that Amy and Jared spent significant time together. Jared spent much of the time traveling for his business, but this is normal for Jared's type of work. When he finished his out-of-state work, he usually returned to Illinois and spent time with Amy. When in Illinois, Jared spent nights at Amy's home or in his RV near Amy's home. Amy traveled to visit Jared at his out-of-state work locations. They kept in contact over the phone when they could not be together in person. The evidence showed that Jared spent the majority of his time with Amy when his business did not require him to work out-of-state. The significant time spent together supports a finding of a *de facto* husband-and-wife relationship.

¶ 38        Third, we consider the nature of activities that Amy and Jared engaged in together. Both Amy and Jared testified that they shared a monogamous sexual relationship. They shared the same bedroom when they spent the night together. They attended concerts and sporting events and traveled around the country together. Amy stayed with Jared when he traveled for work. The two celebrated holidays and birthdays together. Jared purchased gifts for Amy's children. Jared attended family events with Amy, including traveling to California for her son's military graduation. Jared visited Amy's son in the hospital. Amy cared for Jared's cat when he was out of town and took the cat to the veterinarian. These activities give the appearance of a *de facto* husband-and-wife relationship.

¶ 39        Fourth, we review the evidence as to the interrelation of Amy's and Jared's personal affairs, including finances. Although neither shared a joint bank account, Jared used Amy's debit card at an ATM to withdraw money for her on at least one occasion. The two also intermingled other aspects of their life, including (1) opening a shared account at a jewelry store, (2) listing Jared's cat under Amy's account at the veterinarian, and (3) having Jared's vehicle invoices appear on Amy's account. Amy and Jared shared vehicles. Jared knew the garage code to access Amy's home. Jared also visited Grant's military recruiter and attended Grant's military send-off and military graduation. This evidence shows that Amy had interrelated much of her personal affairs with Jared's.

¶ 40        The next factor is whether Amy and Jared vacationed together. Amy traveled to visit Jared on work trips. Jared and Amy went to California to attend Amy's son's military graduation. Amy and Jared also traveled to (1) Las Vegas for Jared's birthday, (2) Minneapolis, (3) Louisville and Indiana, (4) Chicago, several times, (5) Texas, multiple times, (6) Colorado, (7) St. Charles, Missouri, (8) Iowa, and (9) Macomb, Illinois, several times, for family gatherings. Jared and Amy

paid their own expenses on these trips, but that does not discredit the fact that they frequently vacationed together as a couple. Therefore, these trips (which occurred in only a 3½-year period) are vacations that evidence a *de facto* husband-and-wife relationship.

¶ 41　　The last enumerated factor we consider is whether the couple spent holidays together. The two celebrated Christmas and Thanksgiving together in 2018 and 2019. They celebrated each other's birthdays. Jared attended Amy's children's birthdays. They celebrated New Year's together. The evidence is not clear if Amy and Jared spent Easter together, but Jared's mother did send Easter gifts to Jared, Amy, and her children. This factor furthers the appearance of a *de facto* husband-and-wife relationship.

¶ 42　　With respect to the totality of the evidence, we also note that Jared and Amy exchanged rings and have worn their respective rings on their left ring fingers. Somehow, the trial court and this court, in the prior appeal, placed little weight on this fact. But the exchange of rings is a significant fact to support a finding of a *de facto* marriage. Although Jared and Amy denied that the rings symbolized an engagement or marriage, we see no other way to interpret the significance of the rings. Further, Jared had mail sent to Amy's home addressed to "Amy Fogle." Amy claimed he did this so she would know that it was from him. According to Amy, this meant she should wait to open the package until they were together. Her explanation makes zero sense. Jared's and Amy's use of Jared's last name supports a finding of a husband-and-wife relationship.

¶ 43　　After reviewing the six factors and considering the totality of the circumstances, we conclude that the vast majority of the evidence establishes that Amy and Jared cohabited on a resident, continuing basis. 750 ILCS 5/510(c) (West 2020). Therefore, John satisfied his burden of proof, and the trial court's denial of the petition to terminate maintenance was contrary to the manifest weight of the evidence.

¶ 44                                    III. CONCLUSION

¶ 45        For the foregoing reasons, we reverse the judgment of the circuit court of Tazewell County

and remand with directions to enter an order granting John's petition to terminate maintenance.

¶ 46        Reversed and remanded with directions.

**No. 3-21-0026**

| | |
|---|---|
| **Cite as:** | *In re Marriage of Churchill*, 2022 IL App (3d) 210026 |
| **Decision Under Review:** | Appeal from the Circuit Court of Tazewell County, No. 16-D-397; the Hon. Lisa Y. Wilson, Judge, presiding. |
| **Attorneys for Appellant:** | Mitch M. Gilfillan, of Quinn Johnston, of Peoria, for appellant. |
| **Attorneys for Appellee:** | Robert Parker, of Parker & Parker, of Peoria, for appellee. |