NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 220129-U

NO. 4-22-0129

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 28, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| CARMEN R. PETERSON, | ) | Circuit Court of |
|     Petitioner-Appellee, | ) | Knox County |
|     and | ) | No. 18D40 |
| JAMES R.J. PETERSON, | ) | |
|     Respondent-Appellant. | ) | Honorable |
| | ) | James G. Baber, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Turner and Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed an order denying the respondent's petition to terminate his maintenance obligation. The trial court's finding that the petitioner was not in a "*de facto* marriage" with her boyfriend was not against the manifest weight of the evidence.

¶ 2    Respondent, James R.J. Peterson, appeals an order denying his petition to terminate his maintenance obligation to petitioner, Carmen R. Peterson. We affirm.

¶ 3                    I. BACKGROUND

¶ 4    James and Carmen married in 1994. They have six children, two of whom are still minors. In March 2018, Carmen petitioned to dissolve the marriage. Following a trial, the court dissolved the marriage in July 2019. As part of the dissolution judgment, Carmen retained the parties' former marital home in Galesburg, Illinois. James was ordered to pay Carmen $991.40 per month as maintenance.

¶ 5        In April 2021, James petitioned to terminate his maintenance obligation. He alleged that Carmen cohabits with Raymond Scott Colford (Scott) on a "resident, continuing conjugal basis" (see 750 ILCS 5/510(c) (West 2020)). The matter proceeded to an evidentiary hearing. The following is a summary of the evidence.

¶ 6        Carmen resides in Galesburg with two of her children. She is employed by the Galesburg School District as a one-on-one paraprofessional, and she also subcontracts with a local newspaper (Carmen did not specify what her subcontract work entails). Scott resides alone in Logansport, Indiana. He repairs train cars for Transco Railway Products. Logansport is a four-hour drive from Galesburg.

¶ 7        Carmen and Scott met in 2014 or 2015. They developed a romantic interest in each other in 2017, and they began an exclusive dating relationship in mid-2018. Carmen and Scott text or talk on the phone daily. However, because they work and live in different states, they primarily see each other on weekends—usually two or three weekends per month. There has never been a month in which they saw each other every weekend. On special occasions, perhaps 5 or 10 days a year, Carmen and Scott see each other on weekdays. Even though Carmen has summers off from work, she and Scott do not see each other more frequently during summers. Scott goes to Carmen's house more often than she goes to his.

¶ 8        When Carmen and Scott visit each other, they share a bed. Recently, Carmen hosted a foreign exchange student, and the facilitating organization required Scott to submit to a background check because he frequents Carmen's house. Carmen and Scott do not leave any belongings, even toiletries, at each other's houses. Neither has a key or a garage door opener to the other's house. When Scott visits Carmen, she either opens the door for him or tells him to

come in when he arrives. Scott does the same when Carmen visits him. They do not receive mail at each other's houses.

¶ 9    Carmen and Scott regularly take day trips and vacations together. Sometimes some of Carmen's children join them on trips. Carmen and Scott both contribute money toward their excursions, though Scott pays more frequently than she does. Scott usually pays when they go to restaurants, even if Carmen's children are with them. Scott has met all of Carmen's children. He attends some of their extracurricular activities, and he has bought them gifts for special occasions. Carmen and Scott share holidays and other occasions with each other's families.

¶ 10    When James cut Carmen off financially during the divorce, Scott lent her about $6000, which was less than she requested. Carmen repaid Scott without interest.

¶ 11    Scott sometimes gives Carmen gas money when she drives to Logansport, but they do not pay each other's bills. They both purchase the groceries for their own houses. Their finances are completely separate. They have not designated each other as beneficiaries of financial accounts, life insurance policies, or retirement benefits. Although they each pay for their own cars, they sometimes drive each other's cars.

¶ 12    Carmen has a very old home, and Scott is skilled at repairs, so he has done substantial renovation work at her home. Carmen selects the projects and generally pays for materials. Scott uses his own tools and purchases small items, such as spackle and nails. Scott has also helped Carmen with yard work.

¶ 13    The record contains social media posts, photographs, and greeting cards demonstrating that Carmen and Scott are in a committed relationship. For example, Carmen has posted that she appreciates doing life "side by side" with Scott, and Scott has given her cards

expressing his wish to share many more birthdays and Christmases with her. Carmen and Scott coordinate Halloween costumes. They are both avid runners, and they frequently run races together. When Carmen had oral surgery, Scott accompanied her and took care of her, though she did not list him as her emergency contact. Carmen considers Scott part of her "family." Scott does not know whether he considers Carmen "family," as he has "never even thought about it like that." When Scott's mother passed away, his family listed Carmen in the obituary as Scott's significant other.

¶ 14    Carmen testified that she and Scott have discussed marriage. Although Carmen hopes someday to live closer to Scott and get married, they have no current plans to do so. Scott testified similarly.

¶ 15    A friend recently offered Scott a job in Galesburg. Scott turned down the offer due to "[a] lot of factors," such as wages and benefits. Scott testified that Carmen's maintenance was not a factor in that decision. Other than this one occasion, Scott has not looked for employment in Galesburg. He testified that he does "[n]ot necessarily" desire to live in the Galesburg area.

¶ 16    On January 24, 2022, the trial court denied James's petition to terminate maintenance. After recounting the evidence and reciting the applicable law, the court concluded:

> "In this case it is clear the parties are involved in an intimate dating relationship. The parties, however, have not engaged in the permanent day-to-day entanglements of married couples. They reside in separate states, in separately owned homes and do not rely on each other financially for support. Although they are apparently emotional support for each other, they seem to lead separate individual lives throughout the week."

James timely appealed.

¶ 17                                    II. ANALYSIS

¶ 18            James argues that the trial court's ruling on his petition to terminate maintenance is against the manifest weight of the evidence.

¶ 19            Section 510(c) of the Illinois Marriage and Dissolution of Marriage Act provides, in relevant portion: "the obligation to pay future maintenance is terminated *** if the party receiving maintenance cohabits with another person on a resident, continuing conjugal basis." 750 ILCS 5/510(c) (West 2020). This rule addresses "the inequity created when the ex-spouse receiving maintenance becomes involved in a husband-and-wife relationship but does not legally formalize it, with the result that he or she can continue to receive maintenance." *In re Marriage of Herrin*, 262 Ill. App. 3d 573, 577 (1994). In other words, "a receiving spouse who is *de facto* remarried should be treated no differently from a receiving spouse who is *de jure* remarried." *In re Marriage of Susan*, 367 Ill. App. 3d 926, 937 (2006). An obligor spouse who petitions to terminate maintenance under this rule bears the burden of showing that "a *de facto* husband-and-wife relationship exists." *Herrin*, 262 Ill. App. 3d at 576. If the obligor meets that burden, "the burden shifts to the recipient to demonstrate that he or she is not engaged in that type of relationship." *Herrin*, 262 Ill. App. 3d at 576.

¶ 20            There is no precise formulation for what constitutes a *de facto* marriage, but case law indicates it is something beyond an "intimate dating relationship." *In re Marriage of Miller*, 2015 IL App (2d) 140530, ¶ 51. "[N]o two personal relationships are alike," so each case will have its own unique facts. *In re Marriage of Sappington*, 106 Ill. 2d 456, 466 (1985). In determining whether a spouse receiving maintenance has a *de facto* marriage with a new partner, the trial court should consider "the totality of the circumstances." *Herrin*, 262 Ill. App. 3d at 577.

Relevant factors include "(1) the length of the relationship; (2) the amount of time spent together; (3) the nature of activities engaged in; (4) the interrelation of personal affairs (including finances); (5) whether they vacation together; and (6) whether they spend holidays together." *Miller*, 2015 IL App (2d) 140530, ¶ 40. Notably, these factors are "not a checklist" for identifying a *de facto* marriage, as "the circumstances of an intimate dating relationship are also likely to involve facts that fit into each of the six factors." *Miller*, 2015 IL App (2d) 140530, ¶ 46. Thus, a trial court should "weigh the seriousness or magnitude" of these factors, looking for "signs of mutual commitment and permanence." *Miller*, 2015 IL App (2d) 140530, ¶ 50. The court should not limit its focus to the "emotional and social components" of the relationship. *Miller*, 2015 IL App (2d) 140530, ¶ 50. "Instead, courts must also look to the totality of the circumstances to determine whether the new relationship functions practically and economically in a marriage-like way and, if not, whether there is a reasonable explanation as to why it does not (such as each partner's having an individual abundance of resources or estate-planning goals)." *Miller*, 2015 IL App (2d) 140530, ¶ 50.

¶ 21 "This court will not upset the trial court's ruling on a petition to terminate maintenance based on the existence of a *de facto* marriage unless that ruling is against the manifest weight of the evidence." *In re Marriage of Churchill*, 2022 IL App (3d) 210026, ¶ 35. "A decision is against the manifest weight of the evidence if the opposite conclusion is clearly evident or if the decision is unreasonable, arbitrary, or not based on the evidence." *Miller*, 2015 IL App (2d) 140530, ¶ 40. For the following reasons, we hold that the trial court's judgment is not against the manifest weight of the evidence.

¶ 22 The statute contemplates cohabitation on a "resident" basis. 750 ILCS 5/510(c) (West 2020). Carmen and Scott have never lived together. Although that fact does not *per se*

preclude a finding of a *de facto* marriage, it presents "a significant hurdle" for James to overcome in presenting his petition to terminate maintenance. *Miller*, 2015 IL App (2d) 140530, ¶ 64. To that end, cases recognizing a *de facto* marriage where couples maintain separate households are "the exception" rather than the norm. *Miller*, 2015 IL App (2d) 140530, ¶ 64.

¶ 23    The parties cite two cases where the appellate court affirmed findings that couples who resided separately had *de facto* marriages. Both of those cases involved couples who, unlike Carmen and Scott, spent nearly every day together. See *Herrin*, 262 Ill. App. 3d at 577 (finding the wife and her new boyfriend "saw each other every day for over 2½ years" and "spent most evenings together"); *Susan*, 367 Ill. App. 3d at 930 (finding the wife and her new boyfriend "spent nearly every night together" during their more than three-year relationship). *Herrin* is further distinguishable because the wife in that case financially supported her new boyfriend. For example, she allowed him to use her car regularly, he ate most of his meals at her house without paying for groceries, and she assumed a $2000 debt so his computer would not be repossessed. *Herrin*, 262 Ill. App. 3d at 575-76.

¶ 24    *Churchill* is the only case the parties cite where (1) the couple did not consistently live together, (2) the trial court determined that the couple did not have a *de facto* marriage, and (3) the appellate court reversed that finding. In *Churchill*, the party receiving maintenance, Amy, dated Jared for three and a half years. *Churchill*, 2022 IL App (3d) 210026, ¶ 36. Jared primarily lived out of an RV, traveling through various states operating a hail damage repair business. *Churchill*, 2022 IL App (3d) 210026, ¶¶ 9, 20. Amy sometimes visited Jared on his work trips. *Churchill*, 2022 IL App (3d) 210026, ¶ 40. While Jared was away, he and Amy remained in contact through daily phone calls, and she took care of his cat. *Churchill*, 2022 IL App (3d) 210026, ¶¶ 19, 38. Jared sent mail to Amy addressed to " 'Amy Fogle' " (Fogle was his last

name). *Churchill*, 2022 IL App (3d) 210026, ¶ 42. They exchanged rings that they wore on their respective left-hand ring fingers. *Churchill*, 2022 IL App (3d) 210026, ¶ 42. When Jared finished jobs, he always returned to Illinois and spent time with Amy. *Churchill*, 2022 IL App (3d) 210026, ¶¶ 25, 31, 37. Jared knew the code to access Amy's garage. *Churchill*, 2022 IL App (3d) 210026, ¶ 39. They went on numerous dates and vacations, and they spent the holidays together. *Churchill*, 2022 IL App (3d) 210026, ¶¶ 26-28. Although they did not share any bank accounts, Jared used Amy's ATM card to withdraw money for her. *Churchill*, 2022 IL App (3d) 210026, ¶ 39. They used each other's vehicles and shared accounts at a jewelry store and the veterinarian's office. *Churchill*, 2022 IL App (3d) 210026, ¶ 39.

¶ 25 The "signs of mutual commitment and permanence" (*Miller*, 2015 IL App (2d) 140530, ¶ 50) were much more significant in *Churchill* than here. Carmen and Scott maintain separate residences in different states. They see each other on weekends (approximately two or three per month), weekdays for special occasions, and vacations. Even though Carmen has summers off work, she and Scott do not see each other more frequently during summers. Scott passed up a job opportunity that would have brought him closer to Carmen. Carmen and Scott do not have keys to each other's houses. Contrary to James's assertion in his brief that Carmen and Scott have "unfettered access" to each other's houses, there was no evidence indicating that Carmen and Scott feel free to walk into each other's homes unexpectedly or unannounced. Carmen and Scott do not leave property at each other's homes. Although Scott apparently pays more than Carmen toward dates and vacations, their finances are completely separate. They have not designated each other as beneficiaries of any life insurance proceeds or other benefits. Carmen and Scott have discussed marriage generally, but they have not decided to marry. None of these facts are indicative of a marital relationship.

¶ 26 James points to other evidence he contends shows that Carmen and Scott have a *de facto* marriage. To be sure, the evidence showed that Carmen's and Scott's lives have become significantly intertwined during the approximately four years they have dated. Carmen and Scott obviously are in a committed relationship. For example, they talk to each other daily, take trips together, share holidays, dress in couple's costumes for Halloween, and spend time with each other's families. Scott fixes up Carmen's home, and he sometimes helps with yard work. Carmen thinks of Scott as "family," and she posts photographs of him on social media. Scott writes heartfelt notes to Carmen in holiday cards. Scott's family listed Carmen as Scott's significant other in an obituary. Early in their relationship, Scott lent her money when James cut her off financially.

¶ 27 However, none of the evidence James cites is inherently out of character with an intimate dating relationship. Again, the trial court had to consider the totality of the circumstances. *Herrin*, 262 Ill. App. 3d at 577. The issue is not whether the trial court reasonably could have ruled differently. Rather, the question is whether an opposite conclusion is "clearly evident," or the court's decision was "unreasonable, arbitrary, or not based on the evidence." *Miller*, 2015 IL App (2d) 140530, ¶ 40. Considering the totality of the circumstances, the trial court reasonably determined that Carmen and Scott have an intimate dating relationship rather than a *de facto* marriage. Accordingly, the judgment is not against the manifest weight of the evidence.

¶ 28                                III. CONCLUSION

¶ 29 For the reasons stated, we affirm the trial court's judgment.

¶ 30 Affirmed.