NOTICE

Decision filed 03/05/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 230409-U

NO. 5-23-0409

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| BARBARA J. McALLISTER, | ) | Shelby County. |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| and | ) | No. 16-D-17 |
| | ) | |
| ROBERT D. McALLISTER, | ) | Honorable |
| | ) | Amanda S. Ade-Harlow, |
| Respondent-Appellee. | ) | Judge, presiding. |

_____

PREIDING JUSTICE VAUGHAN delivered the judgment of the court.
Justices Boie and McHaney concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's order terminating respondent's maintenance obligation and entering judgment in favor of respondent is affirmed where a *de facto* marriage was established, and the trial court's credibility rulings and findings of fact were not against the manifest weight of the evidence.

¶ 2    Petitioner, Barbara J. McAllister, appeals the trial court's January 19, 2023, order terminating respondent, Robert D. McAllister's maintenance obligation, following the court's May 9, 2023, order denying Barbara's posthearing motion. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4    Barbara and Robert were married on November 26, 1977. On April 5, 2016, Barbara filed a petition for dissolution of marriage. At that time, both parties were 62 years old, and their children

1

were over the age of 18. Barbara owned her own business and Robert was a farmer. The parties ultimately entered into a marital settlement agreement (MSA).

¶ 5 On October 16, 2018, a judgment of dissolution of marriage was issued incorporating the parties' MSA after finding the document was entered into voluntarily and was not unconscionable. The relevant terms of the MSA included the following: Robert would take possession of the marital residence, and Barbara would purchase a new residence. Barbara would take title to her business and all of its accompanying materials and equipment. Robert would take title to the farm, the acreage, all of the accompanying materials and equipment, as well as any grain currently in storage and the crops in the ground. In consideration of the fact that Robert's assets were in excess of Barbara's, Robert agreed to pay Barbara an "equalization payment" of $1.5 million consisting of three payments to be issued between September 2018 and December 2019. The MSA also required Robert to pay Barbara monthly maintenance payments of $4000 until November 4, 2019, at which time the monthly payment would reduce to $3000. The MSA provided for modification or termination of maintenance as allowed by statute or upon either party's receipt of Social Security benefits, Barbara's cohabitation on a conjugal basis, Barbara's remarriage, substantial changes in either party's income, or the death of either party.

¶ 6 Around the same time that the judgment of dissolution was entered, Barbara met John Philbin on an online dating service and began communicating with John. John first met Barbara in person when she was looking for a house in Missouri and joined Barbara and her realtor when they were viewing houses. John purchased a cross necklace for Barbara for her birthday in December 2018. In January 2019, Barbara moved out of the marital home to her new home in Missouri. She hired movers to assist her with the move. While John did not assist with the move, he later presented to Barbara's residence after Barbara called him expressing concern about the drunk

2

movers who refused to leave. John was successful in getting the movers to leave. From January 2019 to April 2019, Barbara and John continued communicating and would go on dates about once a week. Beginning in April 2019, John and his disabled adult son, Drew, began spending the night once a week at Barbara's house during which time Barbara and John were sexually intimate. Barbara and John also attended the birthday party for John's granddaughter in April 2019. On July 31, 2019, Barbara purchased a GMC Acadia in a cash deal. She listed John as the "transfer on death beneficiary" on the Acadia's title.

¶ 7     In August 2019, John's son Kyle moved back from Seattle and moved into Barbara's house until November 2019. John and Drew continued to visit Barbara and spend the night at her home about once a week. While Kyle was living in Barbara's house, Barbara, John, Kyle, and Drew would eat dinner together once or twice a month. In either October or November 2019, John and Drew accompanied Barbara on a trip to the Indianapolis, Indiana, area, to visit Barbara's son and grandson.

¶ 8     In January 2020, Barbara and John went shopping for a truck. On January 9, 2020, Barbara purchased a 2019 Ford F-150 and listed John as the transfer on death beneficiary on the vehicle's title. That same month, John's employment closed due to COVID. Barbara provided money to John to pay his rent in January and February 2020, because John no longer had sufficient funds due to his employment situation. Thereafter, John contracted COVID, and in March 2020, Barbara insisted John and Drew move into her home. John and Drew accepted Barbara's offer and moved into Barbara's home, legally changing their addresses in order to receive mail. From March 2020 to May 2020, John was seriously ill with COVID and subsequently developed pneumonia. Barbara offered to take John to the doctor, but John refused her assistance. During John's illness, Barbara

3

and John were not sexually intimate; however, upon John's recovery in May 2020, they resumed sexual relations, and John and Drew continued to reside with Barbara in her home.

¶ 9    In September 2020, Barbara and John attended John's son Sean's wedding. They traveled to the event separately. Barbara specifically requested not to be in any of the photographs. She presented a gift, consisting of two coolers, as a wedding present. In October 2020, John found new employment that took him out of the home on weekdays during business hours. During John's absence, Barbara would look after Drew who could not be alone. While John and Drew lived at the home, they would help with taking out the garbage. Barbara would buy groceries and household items. Barbara taught Drew how to do his laundry and occasionally purchased shirts and socks for John. Although Barbara and John did not exchange Christmas gifts, Barbara would purchase Christmas and birthday presents for Drew.

¶ 10    On November 19, 2020, Robert filed a petition to terminate Barbara's maintenance. The petition alleged that Barbara was currently cohabitating with another person on a resident, continuing, and conjugal basis. The petition requested termination of Robert's maintenance obligation and reimbursement of maintenance previously paid from the date of Barbara's original cohabitation to the present. On December 12, 2020, Barbara filed a response denying Robert's allegations regarding cohabitation. John and Drew moved out of Barbara's home in April 2021.

¶ 11    Discovery commenced in the pending litigation and the depositions of Robert, Barbara, and John were taken. On March 10, 2022, Robert filed a motion for summary judgment and a memorandum in support thereof. On March 25, 2022, Barbara filed a petition for attorney fees and costs related to the litigation. In support, Barbara alleged that she was unemployed and lacked liquid assets that could be used to pay her attorney fees. On May 9, 2022, Barbara filed a response to Robert's motion for summary judgment claiming that Barbara and John were victims of

4

circumstances stemming from COVID that led to their temporary living arrangement. The response further argued that Barbara and John's relationship never grew into a "deeper level of commitment, intended permanence, and material partnership akin to marriage." Robert and Barbara's pleadings were supplemented with copies of Barbara and John's depositions. A hearing on the motion for summary judgment was held on May 31, 2022. Following the hearing, the court denied the motion for summary judgment.

¶ 12 The trial on Robert's motion to terminate maintenance and Barbara's petition for attorney fees proceeded on September 27, 2022. Robert's testimony revealed that he hired a private investigator and found out Barbara was living with John. Thereafter, he filed the subject petition to terminate maintenance. He identified the MSA and confirmed that he paid the $1.5 million as required under the settlement agreement. He testified that he took out a loan on the farmland to pay Barbara the equalization amounts required under the MSA. He further testified that he made all the required maintenance payments under the MSA.

¶ 13 Barbara was called as an adverse witness. She was currently 68 years old and last worked in December 2018. She confirmed meeting John online in October 2018 and spoke with him online through December 2018. She first met John when she went to look at properties with her realtor at the end of December 2018. She stated that John's apartment was 30 to 45 minutes away depending on the traffic. She agreed that she began a committed dating relationship with John in January 2019, and they were in a monogamous relationship thereafter. They would go out on dates about once a week. Beginning in April 2019, John began spending the night at her home, at which time Barbara and John engaged in an intimate, sexual relationship. When John would spend the night, his son Drew would also spend the night. These sleepovers continued until March 2020, when John and Drew moved in with Barbara.

5

¶ 14 Barbara testified that John moved in because he was ill, and his transfer of residence had nothing to do with a romantic, monogamous relationship. She stated that John had COVID and did not get back to 100% for two to three months. They did not have sexual relations while John was ill. Barbara disputed that she and John resumed a sexual relationship after John recovered, but after being reminded of her prior deposition testimony, she admitted she and John resumed a sexual relationship after his recovery. Barbara testified that she helped take care of Drew while John was sick but denied teaching Drew how to do laundry. After being impeached with her prior deposition testimony, Barbara admitted teaching Drew how to do laundry and agreed she would also remind Drew to take his medication.

¶ 15 Barbara testified that John had three other children in addition to Drew: Michael, Sean, and Kyle, who were also adults. She agreed that she allowed Kyle to live with her from August 2019 to November 2019. She stated this was because John did not have room for Kyle at his apartment. She was unsure if the reason was because she was dating John. Once again, portions of her deposition testimony were reviewed at which time she admitted only speaking with Kyle two or three times before he moved in. Barbara then agreed that she allowed Kyle to live with her because she was dating John. She agreed that once or twice a month, while Kyle was living with her, she, John, Drew, and Kyle would have dinner together. She would usually buy the groceries or pay for the meals that were ordered out. She also agreed that occasionally John or Kyle would do the cooking or ordering out, stating "to some extent" it was a shared duty.

¶ 16 Barbara agreed that she met all of John's children as well as one of his grandchildren. She was invited to, and attended, the birthday party of John's grandchild, who turned two, with all of John's family in April 2019. She also attended the wedding of John's son, Sean, in September 2020. She stated that she and John did not go together; she drove herself. She stated that she had

6

previously spent time or spoken to Sean a couple of times prior to the wedding. She stated she was invited to the wedding because of her relationship with John as well as letting Kyle live with her when he did not have a place to live. She disputed buying a wedding present but, after reviewing her prior deposition testimony, admitted she purchased two coolers as a wedding gift. She agreed that John also met her son Robert in October 2019 who lived around Indianapolis, Indiana. She disputed spending the night in Indianapolis. She believed they returned home later that evening and disputed John's prior testimony to the contrary.

¶ 17   She stated that Drew and John would take out the garbage and occasionally let her dog out while they were living at her house. She disputed that she and John shared the cooking responsibility. After being reminded of her prior deposition testimony, Barbara stated that John occasionally cooked, but continued to dispute that they occasionally shared the responsibility. While John and Drew lived with Barbara, they had to keep their areas clean, but she primarily cleaned the house, especially the common areas. Once in a while they would help her. Barbara disputed spending a lot of time with Drew, stating he was usually in his room. She agreed that she, John, and Drew resided together from March 2020 to April 2021. She stated that John was sick a large part of that time and thereafter he was trying to find a job. When she was reminded that her deposition testimony indicated that John had recovered by May 2020, she admitted her prior testimony was correct.

¶ 18   Barbara agreed that she and John would spend time together watching television or movies, but she also worked outside a lot. She stated John only helped her in the garden once. Upon review of her interrogatories, she agreed that she indicated that she, John, and Drew watched TV, movies, cooked, hunted for rocks, played video games, and rode in her golf cart. At the trial, Barbara clarified that only she and Drew would hunt for rocks, and it was their special thing. She admitted

7

having affection for Drew but stated she did not love him. She further disputed ever having a deep romantic connection with John. She said that she liked him and that was why they dated—to see where it would go—but it did not work out. She stated that she never had hopes of it being a long-term relationship.

¶ 19    Barbara denied doing John's laundry when he had COVID. After being reminded of her deposition testimony, Barbara admitted that she did John's laundry. Barbara stated that she bought Christmas and birthday gifts for Drew but that she and John did not exchange gifts because John had no money. She disputed that John helped her in the garden except one time when he helped her get dirt for the garden. She agreed that John and Drew changed their address to hers when they moved in in March 2020, began receiving mail at her address, and that she listed John as the transfer on death beneficiary on the vehicles purchased during their relationship. She stated that John did not drive the Ford for regular use. She agreed that John did not drive his Nissan because he could not pay the tax on the vehicle required to get the license plate and stated John borrowed one of Sean's vehicles for regular use. She stated that she could not remember when she sold the F-150 truck, but after reviewing the title, agreed it was in April 2021, after John moved out of the house. She agreed that John and Drew continued to reside with her even after John found employment in October 2020, and that they never paid rent while they lived with her. She said they stayed that long because John had to save up money to get an apartment.

¶ 20    Barbara stated that she no longer had $71,000 in her checking account. She currently only had about $40,000. She stated that money went to pay attorneys who were suing a contractor that failed to put a pool in correctly and caused $250,000 in damage to her property. She confirmed her retirement accounts continued to have a combined value of over $1 million. She agreed that COVID was happening during her relationship with John and that most bars and restaurants were

8

closed. She did not know if resorts and airlines were shut down because she did not make any plans to go anywhere. Barbara stated that she never loved John. She stated that he came to live with her because he had COVID and could not afford his rent. She suggested he move in with her and stated the arrangement was never meant to be permanent. She stated that both John and Drew had their own rooms at her house, and after she and John had sex, he would generally go to his own room. She stated that she and John only had sex twice after he recovered from COVID. She and John never shared a bank account, and no funds were ever commingled. She did not cosign any debts with John, never made medical appointments for John or Drew, did not have or give power of attorney to John, they did not purchase gifts for each other, and she never changed her Facebook relationship status. When asked on redirect about sharing a bed with John and having sex once a week after he recovered, Barbara stated that she previously misspoke at her deposition and her testimony at the trial was correct. She stated she was unsure of when her relationship with John ended, but when reminded of her deposition testimony that provided a date of April 2021, Barbara agreed with the date.

¶ 21    John testified that he was employed as a financial advisor prior to COVID. He was currently a mid-level manager for Medicare enrollments. John met Barbara on an online dating site in October 2018. Their first in-person date was in December 2018, and they began dating seriously in January 2019, and he did not date anyone but Barbara from that time until April 2021. In the first year, he and Barbara would go on weekend dates. They either talked or saw each other at least once a week but did not do a lot of going out for dinner or movies. He and Barbara began an intimate sexual relationship between January 2019 and April 2019. On average, he would spend approximately one night a week at Barbara's house. His adult, disabled son, Drew, met Barbara in

9

January 2019 and he would spend the night when John did. John stated that he was in love with Barbara and thought she was going to be his "forever."

¶ 22    John testified that he, Drew, and Barbara visited Barbara's son near Indianapolis in October or November 2019. They spent the night and then drove back the next day. He knew it was winter because it snowed on the way back. They stayed in a hotel and shared the same room. He agreed that Barbara met all of his children and his son, Kyle, lived with Barbara from August 2019 to November 2019. He agreed that Barbara allowed Kyle to live with her because she was in a relationship with him and wanted to help Kyle. John stated that Barbara also attended his son Sean's wedding in September 2020. He could not remember if Barbara attended the rehearsal dinner. He stated that Barbara was invited to the wedding as his guest. Before John could even ask her to be in any pictures at the event, Barbara told him that she did not want to be in any pictures. He stated that was where things were starting to go south.

¶ 23    John testified that he contracted COVID in February 2020 and he and Drew moved into Barbara's house in March 2020. He stayed there at her insistence because he was so sick. He did not have anywhere to go, and it was a dire situation. He stated his only other option was to move to Chicago and live with his father. He left his apartment where he lived for four or five years because he had no money to pay rent. He agreed he had a 401k with some money in it but stated he needed that to get back on his feet and left it as an emergency reserve in case something happened to Drew. John also stated that he would have been taxed a 10% penalty if he took the money out. John confirmed that in addition to his 401k funds he also received stimulus money comprised of two checks totaling $3200. He agreed that he changed his address to Barbara's address. Drew also moved in and lived there full time while John was there, except when Drew was visiting other family. John and Drew moved out in April 2021.

¶ 24    John stated that when he and Drew moved in with Barbara she was very cordial and helpful towards Drew. John believed that Barbara loved Drew. They would go rock hunting to get out of the house during COVID. This was only occasionally—maybe once or twice a month—because usually Drew just played video games. They did go out to dinner for one occasion when the restaurants reopened. Barbara paid. He and Barbara would occasionally watch television together a couple nights a week to find out what was going on in the world. They would also occasionally share meals together, but it was not a regular staple; this was only a couple of nights a week. When confronted with his prior testimony about how often they ate together, John said, "Let's just say three" nights a week. He stated that Barbara provided all the groceries and day-to-day necessities including toothpaste, deodorant, toilet paper, shampoo, and conditioner.

¶ 25    John stated that he began feeling better in May 2020 and at that time he and Barbara resumed their sexual relationship. It would happen approximately three times a month. He believed the relationship ended around December 2020 and he moved out in April 2021. He stated he only drove the Ford pickup truck a few times and would usually borrow a vehicle from his son. He agreed that he was with Barbara when she purchased the truck, which was two months before he moved in. He stated that he did not know that Barbara had listed him as the death beneficiary of that vehicle until his deposition was taken. He stated that Barbara took him to the doctor when he was ill and forced him to go. He stated that while he was sick, Barbara did his laundry and changed the bedding in his room. They did not make any purchases together or share a bank account.

¶ 26    When John went back to work in October 2020, Drew usually stayed with Barbara. She bought birthday and Christmas gifts for Drew. She also took him to the fair. While John did not buy Barbara anything while they were living together, he did buy her a cross necklace for her birthday in December 2018. She bought him shirts and socks after he moved in, and she washed

11

his laundry. He stated that the relationship had already tanked by the time Robert filed the petition. He said that he only intended to stay at Barbara's house until he got back on his feet physically and financially. He stated that he slept in Barbara's bedroom until about September 2020. They went out to dinner once and to one movie. They talked about going to church but never got there. John confirmed that Barbara loaned him a few thousand dollars in January or February 2020.

¶ 27    John stated that Barbara's move to Missouri was not because of him, and her house was 40 miles away from his apartment. He did not help her pick out a house or help her move. She hired a bunch of ex-cons to help her move and he had to go over and get them to leave.

¶ 28    Following the hearing, the court requested the parties provide written closing arguments. On January 19, 2023, the trial court issued its order on Robert's petition for termination of maintenance and Barbara's petition for attorney fees. The court found that while Robert, John, and Barbara provided testimony, only Robert and John were credible and Barbara's testimony "was predominantly not credible." The order then addressed the six factors relevant to determining whether a *de facto* marriage existed. As to the length of the relationship, the court found that Barbara and John were in an exclusive relationship from January 2019 to April 2021. John moved into Barbara's home in March 2020 and was loaned money from Barbara to pay his rent in January and February 2020. The order noted Barbara's care of John's son, Drew, both when John was sick and when John went back to work. The order also found that Barbara minimized her care for Drew whereas John's testimony described the amount of care necessary. The court also relied on John's testimony as to how long they slept in the same bed and when the relationship went sour. The court found that Barbara's actions from March 2020 until Christmas 2020 were contrary to her testimony about her having no desire to remarry.

12

¶ 29    As to the amount of time together, the court noted the activities that Barbara and John shared as well as the activities Barbara and Drew shared. These included meals in the home, gardening, a visit to Barbara's son's house, attending John's son's wedding, birthdays, a trip taking Drew to the fair, riding on golf carts, and rock hunting. The court noted that based on the testimony provided, neither Barbara nor John seemed to be the type to vacation away individually let alone together, further noting that COVID prevented vacationing for the most part. The third factor addressed the activities John and Barbara engaged in and the court referenced its previous findings. As to the fourth factor, the court noted the couple shared no debts or assets but there was no need since Barbara was paying for every need of John and Drew since John was unemployed. The court compared this to a "single income household." The court also noted that Barbara listed John as the beneficiary of both vehicles upon her death and found this evidenced a commitment to permanence with the relationship. As to the issue of intended permanence, the court acknowledged that Barbara testified that she would never remarry but placed little weight on the statement, finding it was made in furtherance of Barbara's benefit and that the court found Barbara to be mostly not credible. The court also noted John's testimony as to his belief that the two were in a committed relationship, believed he loved her, and the relationship was one of a long term. The court noted that John accompanied Barbara when she was looking for a home, the couple was in an exclusive relationship, one of John's sons moved in with Barbara in 2019, and Barbara placed John's name as the beneficiary of both her vehicles. The court also acknowledged Barbara's testimony stating that John only moved into her house because he had COVID. However, the court noted that Barbara could have kept paying John's rent and instead decided to take on the financial burden of moving John and his son into her home and providing for them until April 2021. The court did not find the testimony claiming the situation was temporary credible, noting that even when John

13

found employment he never paid for rent or assisted with any household bills. Finally, the court also addressed the effect the relationship had on Barbara's need for maintenance. The court found that Barbara was using her maintenance award and Social Security income to support John, Drew, and Kyle while they lived in her home, noting that none of them paid rent or contributed to the household expenses. The court noted the testimony revealed that John and Barbara did not go out because COVID closed everything down and there was no testimony that they did not go out because they were not a long-term couple. The court found, based on the testimony provided, that it was a reasonable inference to find the couple would have dined out more often if not for COVID and found the same true about purchases for birthdays, holidays, medical appointments, purchasing vehicles, vacations, and movies. The court also addressed Barbara's argument that but for COVID, she and John would not have moved in together. The court again found that other options, instead of cohabitation, existed, noting that that testimony revealed that Barbara insisted on John moving in with her, and once he did, Barbara paid all the bills, provided food and daily toiletries, took care of Johns's son, spent time with John and his son, and after John recovered, continued an intimate and long-term relationship for another 11 months in the same house. The court found that Barbara cohabited with John on a resident, continuing conjugal basis and they were committed to one another with intended permanency.

¶ 30    Although the court found it unnecessary based on its previous findings, the court also considered the basis for maintenance termination set forth in the MSA. The court noted that the MSA language provided for termination of maintenance solely on Barbara's "cohabitation on a conjugal basis." The court found the facts "clearly showed cohabitation on a conjugal basis without consideration of commitment and intended permanence." Thereafter, the court terminated Robert's obligation to pay maintenance retroactive to April 1, 2020, and issued judgment against Barbara

14

in the principal amount of $102,000 representing maintenance paid at $3000 a month from April 1, 2020, through January 1, 2023. The order also denied Barbara's request for attorney fees.

¶ 31 On February 21, 2023, Barbara moved for reconsideration. In support, Barbara argued that her testimony "predominantly corroborated" John Philbin's testimony and therefore finding her testimony lacked credibility but John's was credible was erroneous. Barbara also argued that the court's six-factor analysis was insufficient, claiming the court's finding that Barbara insisted John move in with her had no support, the decision was based on hypotheticals, and the court erroneously weighed the effect on Barbara's financial needs. The motion was set for hearing on May 9, 2023. Following argument, the court addressed the claims raised by Barbara and denied the request for reconsideration. Barbara timely appealed.

¶ 32                                          II. ANALYSIS

¶ 33 On appeal, Barbara contends the trial court's credibility ruling is against the manifest weight because it found John's testimony credible and Barbara's was not, despite John's testimony corroborating Barbara's testimony. Barbara also argues that the court sought out certain facts that fit into each category for consideration and failed to consider the totality of the circumstances. She cites, for example, the court found the lack of evidence regarding certain factors required further consideration since COVID was in place at that time. Barbara contends that the court's reliance on COVID was only a benefit to Robert, and the court failed to consider COVID when it weighed in Barbara's favor. More specifically, she argues that it was unfair for the court to consider COVID as an explanation as to why the parties did not vacation or go out to eat, but not to consider COVID as the basis of why the parties moved in together. Barbara also contests a statement in the order about her not vacationing with John, as well as the court's finding that the activities she and John did share were activities "people in a committed relationship do," despite the lack of a shared bank

15

account and commingled assets. As to intended permanence, Barbara takes issue with the court's reliance on John's testimony that he believed he was in a committed relationship with Barbara, believed he loved her, and that the relationship was long term because other parts of John's testimony did not reveal as strong of a commitment, and her own testimony did not reveal a commitment. In response, Robert argues that the trial court's findings were not against the manifest weight of the evidence and therefore the decision should be affirmed.

¶ 34 Upon review of a trial court's ruling on a petition to terminate maintenance based on the existence of a *de facto* marriage, this court will not disturb the conclusion, unless that ruling is against the manifest weight of the evidence. *In re Marriage of Bates*, 212 Ill. 2d 489, 523 (2004). "A decision is against the manifest weight of the evidence if the opposite conclusion is clearly evident or the decision is unreasonable, arbitrary, or not based on the evidence." *In re Marriage of Miller*, 2015 IL App (2d) 140530, ¶ 40. Section 510(c) of the Illinois Marriage and Dissolution of Marriage Act provides for a termination of maintenance, based on cohabitation and states that the "obligation to pay future maintenance is terminated *** if the party receiving maintenance cohabits with another person on a resident, continuing conjugal basis." 750 ILCS 5/510(c) (West 2022). The obligation terminates on "the date the court finds cohabitation began" and entitles the obligor "to reimbursement for all maintenance paid from that date forward." *Id.*

¶ 35 We first address Barbara's argument that the trial court's credibility ruling was against the manifest weight of the evidence. More specifically, Barbara argues that the court ruling cannot be upheld because her testimony was consistent with that provided by John, yet the court found John's testimony credible and her testimony not credible.

¶ 36 Upon our review of the record, we note that while there were instances of consistency, Barbara was repeatedly impeached with her prior deposition testimony. In some instances, she

16

stated the deposition testimony was correct and in others she claimed her trial testimony was correct. Notably, these instances occurred when she was questioned about evidence related to the six factors, and in each instance, Barbara's trial testimony minimized her actions despite answers previously provided at her deposition. As the trial court was in the best position to determine the credibility of the witnesses, we defer to the trial court's credibility ruling. *In re Marriage of Manker*, 375 Ill. App. 3d 465, 477 (2007). Here, the record clearly reveals numerous instances where Barbara's credibility was called into question. Accordingly, we cannot hold that the trial court's finding that Barbara's testimony was not credible was against the manifest weight of the evidence.

¶ 37    Barbara next contends that the court sought out the presence of certain facts that fit into each of the six factors and failed to consider the totality of the circumstances. Here, neither party disputes the trial court's reliance on the six factors used for consideration of a *de facto* marriage originally found in *In re Marriage of Herrin*, 262 Ill. App. 3d 573, 577 (1994). Accordingly, we will consider the arguments presented in conjunction with those factors that address (1) the length of the relationship, (2) the amount of time the couple spends together, (3) the nature of the activities the couple engages in, (4) the interrelation of their personal affairs, (5) any vacations together, and (6) how holidays are spent. *Id.*

¶ 38    The first factor involves the length of the relationship. Here, Barbara concedes that the exclusive dating relationship lasted from January 2019 to April 2021, and that John moved in with her in March 2020. Barbara also concedes that she and John resided together on a conjugal basis and shared a bed during that time. However, Barbara takes issue with the court's consideration of the parties' lack of vacationing or going out to dinner in conjunction with COVID. Barbara does not contest that COVID was prevalent for a good portion of the time that John resided with her,

17

and our review of the record confirms that prior to COVID the couple would go on dates, which included going out for dinner and seeing a movie. The evidence further revealed that when the COVID restrictions were lifted, Barbara and John travelled together to visit their relatives, celebrate birthdays, and attend weddings. The court's inference that but for COVID, the couple would have been doing more things outside of the house is reasonable. Barbara also contends that the court failed to weigh the length and magnitude of cohabitation between John and Barbara in light of the consequences forced by COVID from 2020 through 2021. We disagree. John's change of residence in March 2020 was at Barbara's insistence as seen by John's testimony. Nothing in the record supports the conclusion that other options did not exist.

¶ 39    John testified that he could have moved to Chicago and lived with his father. Additionally, Barbara agreed that she paid John's rent the previous January and February and no rationale was provided as to why Barbara did not continue with that action instead of insisting that John and Drew move into her house. Further, while Barbara contends the situation was not intended to be permanent, there was no dispute that once John recovered from COVID in May 2020, the couple resumed sexual relations, attended a wedding later that year, and continued to reside in the same house until April 2021. Even after John finally found employment, the couple continued to reside together for another six months, during which time Barbara cared for John's son while John was at work. As such, we disagree with Barbara's contention that the trial court failed to consider COVID and its effect on the couple or the totality of the circumstances when addressing the length of the relationship.

¶ 40    The second factor addresses the amount of time spent together. Here, Barbara concedes the majority of findings by the trial court which included Barbara and John sharing meals in the home, gardening together, going to Barbara's son's house together, going to John's son's wedding, and

18

spending holidays and birthdays together. The court also made findings about Barbara's time with Drew that included going to a county fair, riding on the golf cart, and rock hunting.

¶ 41    The sole issue raised by Barbara is the court's statement that "[n]othing about John and [Barbara] suggest that they were the type to vacation away individually let alone together" and further noted that COVID "prevented vacationing for the most part." Barbara contends the court's statement "was clearly arbitrary, unreasonable and no [*sic*] supported by the evidence." However, the court was correct in noting that when Barbara and John were together, vacations were prevented by COVID. This finding was supported by John's testimony that revealed people were being ticketed just for being out during the COVID restrictions in St. Louis. The court's finding that there was no evidence that Barbara and John were able, or even wanted to vacation alone or as a couple, was also supported by the record. For example, Barbara testified that she did not know if resorts or airports were closed during COVID because she had not made any plans to go anywhere. Further, Barbara's claim that John testified that he and Barbara did not talk about taking trips together misstates John's testimony. John testified that when he and Barbara were dating, they talked about places they wanted to visit. However, they never talked about going to see those places because "that would have required money." Given the evidence of record, we cannot hold that the trial court's findings related to the amount of time the couple spent together were against the manifest weight of the evidence.

¶ 42    The third factor involves the nature of activities the couple engaged in. Here, Barbara argues that the trial court failed to find that such activities amounted to a *de facto* marriage and instead only stated that these were activities "people in a committed relationship do." Barbara contends that the trial court just "checked off the boxes" and failed to weigh the specific circumstances of the relationship or weigh the seriousness of those activities. We again disagree.

19

¶ 43 The court found the couple "spent a lot of time together on a day in, day out basis" and stated the activities in which John and Barbara participated were "common activities that people in committed relationships do." Notably, these activities included eating meals together, Barbara taking John to meet her son Robert in the Indianapolis area, John taking Barbara to his granddaughter's second birthday party, and both parties attending the wedding for John's son. On appeal, Barbara argues that the court ignored the seriousness and magnitude of the last event by failing to note that John and Barbara did not drive to the wedding together, the wedding was only 15 miles from Barbara's home, Barbara did not attend the rehearsal dinner, Barbara did not appear in any of the pictures because she did not want to be in any of the wedding photos, and the relationship was already starting to deteriorate. However, those facts do not diminish Barbara's attendance at the wedding, and, if anything, bolster the court's findings because, taking those facts as true, it would have been more reasonable for Barbara not to attend the wedding at all when she was only invited as John's guest for the wedding based on his testimony.

¶ 44 Barbara also contends that the court's reliance on the fact that the parties spent holidays and birthdays together was unwarranted because she and John did not exchange gifts and it was "not the All-American family scene." However, the record confirms that Barbara and John agreed not to exchange gifts because he had no money. The record also confirms that despite Barbara having two children of her own, Barbara was spending her holidays with John and Drew. The record also confirmed that a Christmas tree was put up in the home and Barbara bought birthday and Christmas gifts for John's son Drew, took Drew to the fair, and rock hunted with him on her property.

¶ 45 Notably, there is no dispute as to whether the parties participated in the numerous above-stated activities. Nor is there any dispute with the court's finding that these were "common

20

activities that people in committed relationships do." Instead, Barbara contends that the court's finding does not equate to a *de facto* marriage because the activities did not include going on numerous trips (*In re Marriage of Miller*, 2015 IL App (2d) 140530, ¶ 13) or exchanging expensive gifts. We disagree that elaborate vacations or luxurious gifts are required to find a *de facto* marriage. Indeed, such events or exchanges could be considered rare exceptions in most people's lives. What is obvious, is the fact that while Barbara and John's activities may seem mundane when compared with people living a lavish lifestyle, they participated in exciting activities of visiting grandchildren as well as the simple activities in the home, together. Accordingly, we do not find the court's ruling was arbitrary, not based on the evidence, or was not indicative of a *de facto* marriage.

¶ 46    The next factor is the interrelation of personal affairs. Barbara's brief combined this factor with the sixth factor which addresses the effect on the recipient's need for maintenance, and therefore, we will also consider the factors together. Here, Barbara argues that the court failed to put more weight on the fact that the parties did not maintain a joint bank account or commingle their funds. We find this argument has little merit as the evidence revealed that, for most of the relationship, there were no funds or assets to commingle. When John moved in with Barbara, he had no job, no income, and could not even afford to put license plates on his personal vehicle or pay rent. Barbara was the only party with money and the evidence revealed that she used her own money to feed, shelter, clothe, and care for John and his son, Drew. While Barbara downplays the significance of listing John as the transfer on death beneficiary for both vehicles, such act is not indicative of a transient or temporary relationship.

¶ 47    Barbara also relies on *In re Marriage of Edson*, 2023 IL App (1st) 230236, ¶ 185, to claim the "key factor" for these issues is whether the couple's financial affairs were commingled like

that of a married couple. Barbara claims that here, as in *Edson*, there was nothing to untangle. We disagree. First, each case seeking a termination of maintenance must be decided on its own facts. *In re Marriage of Sunday*, 354 Ill. App. 3d 184, 189 (2004). However, the facts in *Edson* are easily distinguishable from the case at bar. In *Edson*, there was no evidence that Julee (the ex-wife) or Curt (Julee's boyfriend) abandoned their own residences. *Edson*, 2023 IL App (1st) 230236, ¶ 54. Curt continued to reside in his apartment, paid the rent and utilities, and performed repairs and maintenance on that property. *Id.* Curt had lived at that apartment for 12 years, his mail was delivered to his apartment, and Julee never assisted in paying Curt's rent. *Id.* ¶ 69. Ninety percent of Curt's work took him out of town, so he would only see Julee two to five times a month. *Id.* ¶ 55. While Curt's son, Gavin, lived with Julee for two weeks so he could study for his GED, when Gavin did not pass the exam, Julee asked Gavin to leave, and he returned to Curt's apartment. *Id.* ¶ 62. When Curt stayed with Julee, he brought his own toiletries and did not keep many personal items at her home. *Id.* ¶ 70. Curt did not have keys to Julee's home and Curt's sons were the beneficiaries of his financial and life insurance accounts. *Id.* ¶¶ 71-72.

¶ 48     Here, the only fact similar to that seen in *Edson* is that neither couple had joint bank accounts or joint debt. However, in the case at bar, John was listed as the transfer on death beneficiary for both of Barbara's vehicles. Further, John abandoned his own apartment, moved in, and received his mail at Barbara's home. Even before John moved, Barbara assisted in paying John's rent. There was no evidence that John placed any of his, or Drew's, personal effects in storage when they moved in with Barbara so those items would need to be packed up and moved when the relationship ended. Accordingly, we cannot find a lack of tangled assets as seen in *Edson*.

¶ 49     We further note that the statement cited by Barbara from *Edson* originally came from *In re Marriage of Susan*, 367 Ill. App. 3d 926 (2006). In *Susan*, although the parties did not comingle

22

their funds, the parties lived together, shared meals together, visited family together, and attended the wedding of a family member. *Id.* at 928-29. The trial court found a *de facto* marriage and the finding was affirmed on appeal. *Id.* at 930. Notably, the *Susan* court found that "the only factor from the above list that weighs against the trial court's finding is the fourth factor: *** [the parties] did not commingle funds or provide each other with monetary support." *Id.* Here, while Barbara contends the court failed to recognize the lack of commingled funds, such contention ignores the fact that Barbara was providing John, and his son Drew, with both monetary and residential support and John had little or no funds to commingle with Barbara. As such, we can find no error in the court's consideration of these issues.

¶ 50    Barbara also contends "the clearest example" that the circuit court's decision was against the manifest weight of the evidence was its reliance on John's testimony to find intended permanence in the relationship. More specifically, Barbara contends that the trial court's finding that John believed the couple was in a committed relationship, he loved Barbara, and further believed the relationship to be one of long term was against the manifest weight of the evidence. However, the record reveals that John testified that he loved Barbara and believed they were in a long-term, committed relationship. While Barbara contends the court ignored John's testimony that he was only planning to stay with Barbara until he got better and was back on his feet, the record revealed that John remained with Barbara after he obtained a job and was receiving income. As such, we disagree that the court's reliance on John's testimony somehow renders the court's decision as against the manifest weight of the evidence.

¶ 51    Barbara next focuses on her own testimony regarding the lack of permanency expected with John's move into her house and John's testimony as to why he moved into Barbara's house. As to Barbara's testimony, the court found it was not credible. For the reasons stated above, we

23

cannot disagree with that finding. Further, as to John's testimony, even if John and Drew's move into Barbara's residence was originally intended to be a temporary situation while John recovered from COVID, the parties' actions after John's recovery showed an intent to make the relationship permanent. It was undisputed that John recovered from COVID by May 2020. Thereafter, John and Barbara resumed an intimate sexual relationship and John and Drew continued to live with Barbara. Barbara and John attended Sean's wedding in September 2020. When John obtained new employment in October 2020, Barbara cared for Drew while John was at work. John remained listed as the transfer on death beneficiary on both the vehicles. As noted by the trial court, Barbara could have continued to pay John's rent in 2020 but instead insisted that John and Drew move into her home. Even after John received stimulus money and found new employment, Barbara did not charge John and Drew rent for living at her home even though she was paying for all of the food and toiletries. Based on these facts, we cannot find the trial court's conclusion that John and Barbara's actions revealed an intent of permanence was against the manifest weight of the evidence.

¶ 52 Barbara's last argument centers on the trial court's consideration of COVID. Here, Barbara complains that the court only considered COVID for those issues that could be used against her and ignored COVID when the evidence benefitted her; in support, she claims the trial court's findings were "atrociously arbitrary." We disagree. The court acknowledged that John's bout with COVID was the culminating event that brought John into Barbara's home. However, while both John and Barbara claimed the arrangement was temporary, the court found their actions undermined the credibility of that testimony, noting that John did not move out after he recovered from COVID, and instead, the couple resumed a sexual relationship. Contrary to Barbara's claims, the trial court considered the uniqueness of the situation and addressed the lack of commingled

funds and the couple's inability to vacation during the pandemic. While the court made inferences based on the evidence, the inferences were not fanciful or unreasonable.

¶ 53   "[O]ur review of the trial court's decision is not based on whether we would come to the same conclusion as the court, but whether an 'opposite conclusion is clearly evident' or if the decision is 'unreasonable, arbitrary, or not based on the evidence.' " *Edson*, 2023 IL App (1st) 230236, ¶ 185 (quoting *Miller*, 2015 IL App (2d) 140530, ¶ 40). Barbara's arguments ignore the evidence or attempt to undermine the evidence relied upon by the trial court in finding a *de facto* marriage. Upon our thorough review of the record, we conclude an opposite conclusion is not evident, and the trial court's findings were not arbitrary, unreasonable, or not based on the record. Accordingly, we hold that the trial court's finding of *de facto* marriage was not against the manifest weight of the evidence.

¶ 54                                    III. CONCLUSION

¶ 55   For the reasons stated herein, we affirm the trial court's finding that Barbara and John's relationship was a *de facto* marriage. Accordingly, we affirm the trial court's order terminating Robert's maintenance obligation and judgment of reimbursement against Barbara.

¶ 56   Affirmed.

25